James P. CONDE, et al., Plaintiffs,

v.

VELSICOL CHEMICAL CORP., Defendant.

No. C2–85–638.

United States District Court, S.D. Ohio, E.D.

Oct. 13, 1992.

David Kopech, Columbus, Ohio, for plaintiffs.

David Greer, Dayton, Ohio, Joe G. Hollingsworth, Bruce J. Berger, Bonnie J. Semilof, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

Plaintiffs James P. Conde, Rhonda Conde, Ryan Conde, Autumn Conde, and Kimberly Conde bring this action alleging that Defendant Velsicol Chemical Corporation ("Velsicol") caused them personal injuries and deprived them of the economic value of their home when Swat Exterminators applied Velsicol's Gold Crest C–100 insecticide to their home. The Condes allege that their exposure to chlordane, the insecticide, caused them headaches, nausea, diarrhea, liver problems, blood irregularities, immune system dysfunction, and other personal injuries. They further allege their house is uninhabitable.

Velsicol has filed the following motions:

1. For summary judgment on issues of medical causation filed June 1, 1992.
2. For summary judgment on fear and emotional distress claims filed June 1, 1992.
3. For summary judgment on product defect claim filed June 1, 1992.
4. For summary judgment on claims for punitive damages filed June 1, 1992.
5. For summary judgment on property damage claims filed June 1, 1992.
6. For summary judgment on warning claims filed June 1, 1992.
7. *In limine* to exclude opinion testimony of plaintiff Dr. James P. Conde filed June 1, 1992.
8. *In limine* to exclude opinion testimony of Peter McConnachie, Ph.D. and Arthur Zahalsky Ph.D. filed June 1, 1992.
9. To strike improper Rule 56 material filed July 16, 1992.
10. *In limine* to exclude evidence of testimony relating to the Illinois grand jury proceeding filed July 16, 1992.
11. *In limine* to exclude evidence and testimony concerning the August 11, 1987 Memorandum of Understanding and Accompanying Voluntary Product Withdrawal filed July 16, 1992.
12. *In limine* to exclude from evidence the July 1987 EPA draft Technical Support Document filed July 16, 1992.
13. Second motion to strike improper Rule 56 materials filed August 21, 1992.
14. *In limine* to exclude evidence and testimony relating to (1974–75) EPA Cancellation proceedings filed September 11, 1992.
15. To exclude evidence and testimony of the 1986 Carcinogenicity Assessment Group Report (CAG) filed September 11, 1992.
16. *In limine* to exclude opinion testimony of Robert K. Simon, Ph.D. relating to product defect filed September 11, 1992.
17. *In limine* to exclude opinion evidence concerning the alleged nature of untested house debris as "hazardous waste" filed September 11, 1992.
18. *In limine* to exclude opinion evidence by Dr. Simon and others concerning alleged presence of transnonachlor in plaintiffs' blood filed September 11, 1992.
19. *In limine* to exclude evidence concerning death and alleged illnesses of family cat filed September 10, 1992.
20. *In limine* to exclude evidence and testimony regarding certain state regulatory proceedings and actions filed September 10, 1992.

On June 23, 1992, plaintiffs filed a motion for leave to file a second amended complaint.

The Court will address in this Opinion plaintiffs' motion for leave to file an amended complaint and Velsicol's motions for summary judgment on medical causation, the product defects claim, and the property damage claims, as well as its motions to exclude the opinion testimony of Drs. Conde, McConnachie, and Zahalsky, the motions to strike Rule 56(e) material, and the motion to exclude the July 1987 EPA Technical Support Document. In considering the motions, the Court first outlines the basic facts relating to the Condes' claims against Velsicol. Next the Court grants plaintiffs' motion for leave to file an amended complaint. Then the Court con-

siders the motion for summary judgment on the product defects claim. The Court holds that, reserving ruling on the element of medical causation, plaintiffs state a claim under the consumer expectation test, but that defendant is entitled to summary judgment under the risk benefit analysis.

The Court then turns to the evidentiary motions and denies Velsicol's June 1, 1992 motions to exclude the opinion testimony of Drs. Conde, McConnachie, and Zahalsky. Next the Court grants Velsicol's motion to strike the Epstein article, Harbison affidavit, and Hollingsworth letter, but denies the motion as to the Infante article. The Court denies Velsicol's motion to exclude the 1987 TSD.

Then the Court grants Velsicol's motion for summary judgment on medical causation, concluding that plaintiffs have failed to offer opinion testimony admissible under Rules 702 and 703, Fed.R.Evid. from which a jury could find by a preponderance of the evidence that the Condes' exposure to chlordane caused their symptoms and diseases. Having granted summary judgment on medical causation, the Court further concludes that Velsicol is consequently entitled to summary judgment on plaintiffs' product defects claim. Finally, the Court denies Velsicol's motion for summary judgment on the property damage claims, finding a conflict of material fact about whether the Conde home has suffered compensable property damage.

## BASIC FACTS

The Court views the facts in the light most favorable to plaintiffs. When there are fact conflicts, the Court accepts the facts asserted by plaintiffs as true.

In 1982 Darrell Mitchell contracted with the Condes to construct a new home for them at 33449 Wills Hill Road, Pomeroy, Ohio. Mitchell was to provide the Condes with a full pre-treatment of insecticide to protect the home against termites and other pests. He failed to do so. In the Spring of 1983 the Condes had already moved into the house although construction still continued. To provide some termite protection, Mitchell and John Swepston, own-

er/operator of Swat Exterminating (Swat), agreed to a partial treatment. Mitchell drilled holes into concrete block, and on or about April 8, 1983, Swat applied 400 gallons of Velsicol's Gold Crest C–100 solution to the basement walls and the soil perimeter of the Conde home. Mitchell was then to refill the holes, but he failed to do so.

Plaintiffs assert that following the application, chlordane seeped into the living areas, vaporized, and emitted toxic fumes throughout the house. The Condes allege that soon after their exposure all family members experienced headaches, nausea, diarrhea, and other physical discomfort caused by Velsicol's chlordane. On April 16, 1983, Kimberly Conde, then 15 months old, was hospitalized for dehydration following a bout of severe vomiting, diarrhea, and fever.

When the Condes' search for a cause of their symptoms turned to the termiticide applied in April 1983, Velsicol told them it was safe to remain in their new home. However, they continued to experience headaches, nausea, and other physical symptoms. Their cat died unexpectedly in August 1986, and subsequent tests revealed chlordane in the cat's liver. In November 1986, the Condes moved out of their home. Since then, they have been living in a double-wide mobile home located elsewhere on the same property. Once the Condes moved from their home, their acute symptoms subsided.

Defendant Velsicol asserts, and plaintiffs do not controvert, that the highest average level of chlordane ever measured in the Conde's home is roughly one microgram per cubic meter ($1 \, ug/m^3$), which is $\frac{1}{16}$ part per billion.

Plaintiffs state that chlordane can persist in the human body for up to 30 years. It is retained mainly in fat cells. However, defendant states, and plaintiffs do not controvert, that the Condes are unable to show the presence of chlordane in their bodies at all, despite numerous fat samples, blood samples, urine samples, and liver and bone

marrow biopsies.[1]

Two of the more serious long-term consequences identified by plaintiffs are that Ryan Conde suffers from an elevated bilirubin count[2] and that Rhonda Conde has suffered blood irregularities and neurological injury. All plaintiffs argue that due to their chronic exposure to chlordane they have suffered damage to their immune systems and central nervous systems.

Defendant asserts that the Ohio Department of Health has reported that the Conde's house would be habitable with a relatively minor clean-up.[3] Plaintiffs do not controvert this assertion in their responsive brief.

Plaintiffs have settled their claims against Swat. The suit continues against Velsicol, the manufacturer of the termiticide (chlordane).

## AMENDED COMPLAINT

Plaintiffs' June 23, 1992 motion for leave to file a second amended complaint is GRANTED. All counts relating to Swat Exterminators, Inc. of the amended complaint are DISMISSED with prejudice. Velsicol is not prejudiced by plaintiffs' elimination of all references to Swat Exterminating from the complaint. Swat is no longer a defendant. Plaintiffs' claims against Velsicol have always been based on Velsicol's conduct. If Velsicol believes it has a viable defense based on Swat's alleged negligence, it is free to pursue that defense at trial. Velsicol's remaining objections to assertions made in the Second Amended Complaint are the subject of other pending motions and will not be considered here.

## PRODUCTS DEFECTS

In *Knitz v. Minster Machine Co.*, 69 Ohio St.2d 460, 432 N.E.2d 814 (1982), the Ohio Supreme Court held that:

A product design is in a defective condition if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risks inherent in such design.

This formulation of the test for a defective product is based on § 402A of the Restatement (Second) of Torts, which was adopted by the Ohio Supreme Court in *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977). Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The Rule stated in Subsection (1) applies although

---

1. Dr. Robert K. Simon has interpreted blood studies to demonstrate the presence of transnonachlor in the Condes' blood. On September 11, 1992, Velsicol filed a motion to exclude this opinion evidence.

2. Plaintiffs asserted in one of their earlier briefs that Ryan suffers from an enlarged liver, but that factual assertion is not contained in Dr. Conde's July 31, 1992 affidavit.

3. In an August 1, 1990 letter to Jon D. Jacobs, Deputy Health Commissioner, Meigs County Health Department, Dr. Irena Scott, a Researcher 3 in the Health Assessment Branch, Division of Epidemiology of the Ohio Department of Health, recommended that the Condes not live in the house because of their "initial exposure to unknown but possibly high chlordane levels and their continuing low level exposure" (which might exacerbate their existing health problems), but that others could live in the house if it were cleaned up. Suggestions for a cleanup included sealing all cracks in the basement, removing any contaminated soil, washing the contaminated surfaces and treating them with a sealant, and treating the top row of foundation blocks with expandable polyurethane foam or with concrete. Carpeting and upholstery would have to be removed. Dr. Scott noted that air samples taken inside the house in 1987 were within a range considered habitable by the U.S. Public Health Service. Exhibit 46, Velsicol's Appendix in Support of Dispositive Motions.

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

In *Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 424 N.E.2d 568 (1981), a Jeep rollover case, the Ohio Supreme Court extended the § 402A analysis to design defects. The court stated that "[w]ith regard to design defects, the product is considered defective only because it causes or enhances an injury." *Id.* at 465, 424 N.E.2d 568.

In *Cremeans v. International Harvester Co.*, 6 Ohio St.3d 232, 452 N.E.2d 1281 (1983) the Ohio Supreme Court held that *Knitz, supra,* articulated a single test with two alternatives and that a plaintiff can prove that a product is defective by showing either: that the product design is in a defective condition because the product fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner (the consumer expectation test); or, that judged using relevant criteria, the product design is in a defective condition because the benefits do not outweigh the risks inherent in such design (the Risk/Benefit Test). *Cremeans,* 6 Ohio St.3d 232, 452 N.E.2d 1281 at syllabus. Plaintiffs offer evidence to support both theories.

Velsicol maintains that plaintiffs claim against Swat was that the termiticide was misapplied. Defendant argues plaintiffs' misapplication theory is inconsistent with their products liability claim.

Second, Velsicol asserts that the highest average measured air concentration of chlordane in the Condes' house has been less than one micron per cubic meter (1 ug/m³). In contrast, the permissible OSHA exposure level for workers exposed to chlordane 8 hours a day, 5 days a week, 50 weeks a year is 500 ug/m³. 29 C.F.R. § 1910.000.

■ *Consumer expectation.* Under the consumer expectancy prong, the defendant will incur liability for a defective product if the product is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. *Knitz, supra,* at syllabus.

■ In *Knitz, supra,* the court indicated that the question of whether a product was defectively designed could be considered by a jury using hindsight, that is, a product may be found to be defective in design even if it satisfies ordinary consumer expectations if the jury determines that the product's design embodies "excessive preventable danger." 69 Ohio St.2d at 465–466, 432 N.E.2d 814. The consumer expectancy test is designed to reflect the commercial reality that, implicit in a product's presence on the market, is a representation that it will safely do the jobs for which it was built. *Id.* at 460, 432 N.E.2d 814. The test utilizes an objective standard and not the subjective expectations of a particular user or consumer. *Leichtamer, supra,* 67 Ohio St.2d at 467, 424 N.E.2d 568; *Delk v. Holiday Inns, Inc.,* 545 F.Supp. 969, 971 (S.D.Ohio 1982).

■ Velsicol contends that the presence of trace levels of chlordane in living areas cannot be regarded as an unexpected or unintended consequence of using chlordane as a termiticide. Velsicol notes that the 1983 EPA Report commented on numerous public studies which "demonstrated the possible presence of trace levels of termiticides in treated homes." Defendant's Motion for Summary Judgment at 19. Whether or not objective consumers expected trace levels of chlordane in the living areas of their homes is not dispositive under the consumer expectation test. The relevant inquiry is whether the objective consumer thought the product was safe and would not cause adverse health effects.

In *Delk, supra,* the court held that the manufacturers of carpeting and wall covering were not liable under the consumer expectation theory of strict liability for plaintiffs' injuries sustained in a hotel fire where the manufacturers did not advertise or represent to motel purchaser that their products were fire and smoke resistant.

Plaintiffs argue that Velsicol's labels, manuals, and advertisements contained

misstatements which raised consumer expectations about product safety, including:

—Independent study reveals "no evidence of any long-term latent effect."

—Chlordane "does not pose a threat to health when it has been used properly."

—There is "little opportunity for you or your pets to be exposed" to Chlordane.

—Chlordane is one of the "safest insecticides presently in use for control of termites...."

Plaintiffs assert that the second and third representations above were contrary to Velsicol's own pre–1983 studies. Dr. Simon's January 1992 deposition at pp. 132–134 and 140–141; W.P. Cahill and N.C. Jimenez's March 3, 1983 Velsicol internal report. Further, plaintiffs urge, any ordinary consumer would be led to believe by the above representations that Velsicol's chemical products were lethal to termites but would not harm them. Finally, plaintiffs allege that at the end of 1984 Dr. Conde talked with a Velsicol employee and a researcher that employee referred him to, both of whom assured him that Velsicol had no problem with chlordane and that chlordane was safe, not toxic. Dr. Conde's October 30, 1986 deposition at pp. 24–26; Dr. Conde's September 26, 1991 depositions at pp. 206–207.

Velsicol responds that plaintiffs have admitted that no Velsicol communication ever came to their attention prior to the application of Gold Crest C–100 to their house. Supplemental Answer of Plaintiffs to Interrogatories, No. 7 (April 29, 1992) (Attachment C to Velsicol's Reply). Although plaintiffs assert that the Velsicol documents containing the alleged misstatements reached home owners, they fail to offer any evidence supporting that allegation. Velsicol alleges that most of the documents were directed to professional pest control operators. Finally, defendant argues that none of the documents suggest that there is absolutely no exposure to trace amounts of chlordane. Even had plaintiffs read the documents, they could not reasonably have formed the opinion that they would not be exposed to average

levels below 1 ug/m³ (¹⁄₁₆th of a part per billion), the highest level of chlordane ever measured at the Condes' home.

Dr. Conde's alleged telephone conversations with a Velsicol employee and Dr. Calo occurred long after the product was applied. Moreover, Dr. Conde testified that he did not believe the representations they made. Dr. Conde's September 27, 1991 deposition at p. 241; Dr. Conde's September 28, 1991 deposition at pp. 563–564 and 567–568.

■ *Risk-benefit analysis.* Under Ohio law, the relevant factors in considering whether a product is defective under the risk/benefit test include: (1) the likelihood that the product will cause injury; (2) the gravity of the danger posed by the design; (3) the mechanical and economic feasibility of an alternative design; (4) the relative costs of producing, distributing and selling an alternative design; and (5) new or additional harms that may result from an alternative design. *Knitz,* 69 Ohio St.2d at 466, 432 N.E.2d 814; *Cremeans,* 6 Ohio St.3d 232, 452 N.E.2d 1281. The plaintiff need not prove all five factors to establish that the defendant's product is defective, but rather, "[t]he appropriate factors, and the weight allocated to each factor, will vary with the facts of each case." *Cremeans,* 6 Ohio St.2d at 235, 452 N.E.2d 1281 (footnote omitted).

Velsicol first argues that the 1983 EPA report conclusively establishes that Gold Crest C–100 is not a defective product. Although the 1983 EPA report concludes that the benefits of chlordane use outweigh the risks, the EPA explicitly stated that the risk assessment was incomplete. The report concludes that:

After consideration of the available information on the risks and benefits for the termiticides the Agency concludes that the benefits from their use to control subterranean termites are extremely high. *The risk assessment for these chemicals is incomplete* because of the lack of definitive data on the extent of human exposure, the amount of exposure, and most importantly, data on the critical biological end point (health effect)

in humans exposed to these pesticides. At this time in assessing the risks and benefits associated with the total national use of the termiticides based on available data, and *considering the lack of data* outlined above, the Agency finds that the benefits from the use of the currently registered pesticides outweigh the potential risks. *The Agency recognizes that in individual cases where termiticides were improperly applied or misused in treating a residential dwelling, the risks from exposure may exceed the benefits.*
1983 EPA Report at V–4, V–5 (emphasis added). Contrary to Velsicol's assertion, the 1983 EPA report does not "conclusively" establish that the benefits of chlordane outweigh the risks. Rather, the report indicates that the risk assessment is "incomplete" due to the "lack of data." Finally, the EPA concludes that in a misapplication case "the risks from exposure may exceed the benefits."

Plaintiffs principally rely on a July 1987 Technical Support Document (TSD) prepared by the USEPA. The TSD "presents EPA's evaluation of the risks and benefits of [chlordane, heptachlor, aldrin and dieldrin] for use on subterranean termites." TSD, Executive Summary at i. Plaintiffs have submitted evidence which suggests that the 1987 TSD is a final agency document representing the current EPA assessment of the risks and benefits associated with the use of cyclodien insecticides. *See* Memorandum of Daniel Banolo, Affidavit of William Marcus. The report relies on a National Academy of Sciences Natural Research Center's Committee on Toxicology (NRCCT) report which states that it could not determine a level of exposure to chlordane below which there would be no biologic effect under conditions of prolonged exposure. *Id.*

Velsicol counters that the 1987 TSD is a draft that has never been issued by the EPA. Further, the Report is incomplete and lacks a concluding section, has never been peer-reviewed, and has been disavowed by USEPA officials in charge of the Office of Pesticide Programs at the time of its preparation. Moreover, Velsicol asserts

the 1987 TSD is irrelevant to the 1983 risk-benefit analysis required here. (The termiticide chlordane was applied to the Condes' home in the spring of 1983.) Finally, the 1987 TSD is inadmissible hearsay. As such, plaintiffs cannot rely on it to resist defendant's motion for summary judgment.

The 1983 USEPA Report balanced the estimated $100 million to $3.5 billion dollar annual damage to buildings from termites against the less effective and more costly alternatives available in early 1983. It concluded that "chlordane, heptachlor, and aldrin are the most cost-effective chemicals for termite control." *Id.* at III–7. The 1983 USEPA Report also identified health risks from these termiticides. The 1983 report concluded: the benefits from the termiticides are very high and those benefits outweigh potential risks (even though trace levels of the termiticides will remain in the building treated). Plaintiffs counter that the 1987 TSD reached the opposite conclusion. *Id.* at pp. i & ii.

Next Velsicol argues that it is entitled to summary judgment on the risk-benefit test because plaintiffs' expert testimony fails to create a genuine issue of fact about whether Gold Crest C–100 is defective. Dr. Robert K. Simon, an analytic chemist, testified for plaintiffs that technical chlordane could have been manufactured so as to remove a number of unspecified "volatile components." Defendant maintains that testimony is entitled to no weight because Dr. Simon has no expertise in or knowledge about the manufacture of termiticides or other chemicals. Plaintiffs' memorandum contra makes no response to this argument. It does assert that Dr. Simon explained why the product was unsafe during his 1992 deposition at pp. 98–99 and 103–107. Similarly, Velsicol argues that plaintiffs' expert Dr. Arthur C. Zahalsky, a geneticist and microbiologist, has no training or experience to permit him to express an opinion on alternative methods for manufacturing chlordane. Again, plaintiffs did not respond to this argument in their brief.

In its reply brief, Velsicol advances four reasons Dr. Simon's opinions are of no evi-

dentiary weight. First, Dr. Simon's conclusory opinion that the product is unsafe is based on his apparent opinion that a product must be absolutely safe. Second, he bases his opinions on the 1987 TSD. Dr. Simon's November 13, 1991 deposition at p. 39. That report has no evidentiary value. Third, Dr. Simon's opinion is based on the alleged inadequacies of Velsicol's warning labels, but plaintiffs have withdrawn that claim. Fourth, Dr. Simon has no expertise about alternative pesticides, alternative methods of pesticide control, and no knowledge about which pesticides were available for use as a termiticide in 1983.

■ *Conclusions.* Defendant has failed to demonstrate that it is entitled to summary judgment dismissing in the entirety plaintiffs' products defects claims. Under the *consumer expectation test,* consumers of residential termiticides in the Spring of 1983 would reasonably have believed that there would be no serious adverse health consequences from the application of Velsicol's Gold Crest C–100 to their residence. Consequently, if plaintiffs have admissible evidence to offer from which a jury could find by a preponderance of the evidence that the application of the chlordane to the Condes' residence caused the diseases and symptoms reported by Dr. Conde, they would be entitled to have the matter go to the jury for their determination.

■ Plaintiffs have offered no admissible evidence supporting a charge to the jury on a *risk-benefit analysis* theory. Plaintiffs' experts have no knowledge of alternative termiticides available during or prior to the Spring of 1983, no knowledge of how termiticides are manufactured, and the like. Consequently, although plaintiffs have offered evidence about the likelihood that Velsicol's product will cause injury and the gravity of the danger posed by the product, they have failed to offer admissible evidence regarding the mechanical and economic feasibility of an alternative design, the relative costs of producing, distributing, and selling an alternative design, and the new or additional harms that may result from an alternative design. The 1987 TSD is not evidence which cures this deficiency. First, the 1987 TSD was not available to the industry during the Spring of 1983 and before. Second, the product alternatives relied upon in the 1987 TSD were not generally available in the Spring of 1983.

## EVIDENTIARY MOTIONS

Many of the motions for summary judgment now at issue cannot be properly evaluated without first deciding several threshold evidentiary issues. Accordingly, the Court will first proceed to these issues.

*Motion by Velsicol* In Limine *to Exclude Opinion Testimony of Plaintiff Dr. James P. Conde*

Defendant has filed a motion *in limine* to exclude the intended expert opinion testimony of plaintiff, Dr. James P. Conde, on the grounds that Dr. Conde cannot be considered an expert witness under Fed. R.Evid. 702 and 703 because of his biased, non-objective status in this case as an interested party.[4] Velsicol further maintains that Dr. Conde's testimony should also be excluded under Fed.R.Evid. 403 because its inflammatory nature would render it unduly prejudicial in comparison to its limited probative value.[5] Plaintiffs maintain that

---

**4.** Rule 702, Fed.R.Evid., provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> Rule 703, Bases of Opinion Testimony by Experts, provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

**5.** Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

defendant's motion is merely an attempt to deprive plaintiffs of their best medical evidence through the use of misleading and factually deficient allegations regarding Dr. Conde. Plaintiffs further argue that it is only because Velsicol cannot contradict Dr. Conde's medical testimony that it has purposely decided to use "egregious 'tactics and maneuvers' to attempt to exclude such testimony." Plaintiffs' Statement Contra at p. 1.

This is not the first instance the Court has had occasion to consider Dr. Conde's dual role in this litigation. Dr. Conde is a plaintiff in this action. He is also a licensed doctor of osteopathic medicine who specializes in family practice. He is the primary treating physician for the Conde family. In October 1991, Magistrate Judge Abel, in response to defendant's motion to compel answers to deposition questions, concluded that "Dr. Conde's role as a party to this lawsuit is predominant and ... defendant will be allowed to depose him without being required to compensate him for his time [under Fed.R.Civ.P. 26(b)(4)(C).]." October 24, 1991 Order at 7.[6]

Magistrate Judge Abel's ruling on the prior discovery dispute sought to reconcile a novel question of law. The question presented in that dispute was whether the Federal Rules of Civil Procedure require the defendant to provide expert witness fees in order to take the plaintiff's deposition because the plaintiff was an "expert" as to some issue in the case. Magistrate Judge Abel answered the question in the negative. He ruled that defendant would be allowed to depose Dr. Conde for an additional four hours without payment of expert witness fees. However, when the four hours of deposition time contemplated in the October 24, 1991 Order proved to be inadequate, Magistrate Judge Abel further ruled:

*Dr. James P. Conde* is ORDERED to sit for the completion of his deposition. He has already testified for three and a half days. I had hoped that the expert portion of his deposition could be completed within four hours. All counsel agree that Dr. Conde's testimony is not completed and that *defendants reasonably have the right to complete Dr. Conde's deposition as an expert. Defendants are ORDERED to pay Dr. Conde the hourly rate he previously requested for his expert testimony.*[1] Dr. Conde also remains under a duty to be re-deposed as a non-expert, limited to events occurring subsequent to (or first known to defendants subsequent to) the conclusion of his previous deposition as a non-expert. Dr. Conde is not entitled to compensation for his "non-expert" testimony.

1. Pursuant to my previous order, Dr. Conde was not compensated for the four hours of expert testimony he recently gave. The present Order does not alter my previous Order. Dr. Conde is not entitled to payment for those four hours. *He is entitled to the payment of a reasonable hourly rate for any expert testimony he gives on deposition in the future.*

December 17, 1991 Order at 2–3 (emphasis added).

The October 24 and the December 17 Orders contemplate that Dr. Conde would qualify as an expert witness as plaintiffs' treating physician. Often the testimony of the primary health care provider is the most relevant medical testimony concerning a plaintiff's alleged injuries.

Velsicol argues that Dr. Conde should not be allowed to testify as an expert under Rules 702 and 703 because he lacks the required objectivity required of expert witnesses. Velsicol argues that Magistrate Abel's October 24, 1991 Order establishes as the law of the case that Dr. Conde cannot be considered an expert witness be-

6. In the October 24, 1991 Order, Magistrate Judge Abel relied primarily on the so-called "in-house" expert cases which generally hold, although not unanimously, that employees of parties who have special areas of expertise and who would usually qualify as experts if specially retained for litigation are treated as ordinary witnesses for discovery purposes. *In re Kegg,* 116 F.R.D. 643, 644 (N.D.Ohio 1987) (retired employee of tire company would not be compensated for appearing at deposition concerning work done before he retired under Rule 26(b)(4)); *Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co.,* 68 F.R.D. 397, 406 (E.D.Va.1975). *See also, In re Shell Oil Refinery,* 132 F.R.D. 437, 441 (E.D.La.1990) (noting the conflicting authorities).

cause his role as a party is predominant. Defendant also argues that Dr. Conde's extreme emotional involvement in this case precludes his role as an expert witness.[7]

In *Viterbo v. Dow Chemical Co.,* 646 F.Supp. 1420, 1425–26 (E.D.Tex.1986) (citing *Johnston v. United States,* 597 F.Supp. 374 (D.Kan.1984)), the court observed that "where an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading." The "most important" factor for the court in excluding the opinion testimony of plaintiff's expert in *Viterbo* was that the expert "affirmatively sought employment from the plaintiff's attorneys in this case; thus, he ... did not view Viterbo's condition objectively." *Id.* Similarly, in *In re Air Crash at Detroit Airport,* 737 F.Supp. 427, 430 (E.D.Mich.1989) *aff'd without opinion,* 917 F.2d 24 (6th Cir.1990), the court held that the president of a national "right to life" organization could not provide expert testimony as to when a fetus becomes viable because the witness could not be considered to be objective. Both of these cases, however, turn, at least in part, on the fact that the experts had preconceived notions before the litigation commenced.

Dr. Conde's affidavit opposing the motion to exclude his opinion testimony states: he conducted objective tests and made objective evaluations; he listened to the complaints of the plaintiffs; and, he conducted physical examinations and referred family members to specialists when medically indicated. Further, his affidavit states that he has undertaken an exhaustive study of the medical and scientific literature regarding chlordane and its effects on animals and humans.

▪ Should this case proceed to trial, Velsicol is clearly free to challenge Dr. Conde's methodology, diagnosis, assumptions, and qualifications through cross-examination and through the presentation of its own witnesses. Velsicol may also argue its position that he has let his concern for his and his family's health and their economic interest in this lawsuit affect his professional judgment. Ordinarily when the Court is confronted with a "battle of the experts," the jury must decide the victor." *In re Bendectin Products Liability Litigation,* 732 F.Supp. 744, 748 (E.D.Mich. 1990) (citing *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1535 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984)). The question here is whether defendant has demonstrated that Dr. Conde is so obsessed with what he perceives to be Velsicol's tortious conduct that he cannot function as an expert witness at trial.

▪ Defendant cites several cases in which courts have held that plaintiffs cannot provide expert testimony in their own cases. *See Proteus Books Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502 (2nd Cir. 1989); *Yoder Bros., Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347 (5th

---

7. Defendant Velsicol quotes deposition testimony of Dr. Conde in support of its allegation that Dr. Conde lacks the objectivity to render opinion testimony. A sampling of materials cited by defendant follows:

[they are] worthless [because] ... they have polluted this country, they've ruined the rivers, they've ruined the land and they've killed the people. That's what I mean. And not to mention that, but they've disabled millions of people that don't even recognize why they're disabled. And now they're disabling the rest of the world since they can't do it here any more.

September 26, 1991 deposition of Dr. Conde at p. 82.

Velsicol Chemical Company is an irresponsible company. I could go for four hours on this one question.

November 1, 1991 deposition of Dr. Conde at p. 5.

Dr. Conde also attacked Velsicol's counsel:

I think that you are a game player.... I think that you're [a] manipulator of facts, a twister of facts, a twister of the truth, not a seeker of justice or truth. That's what I think of you.... I think you're a typical big company attorney.... I think I've been manipulated for about 7 or 8 years. This is just a continuation of the manipulation.

*Id.* at p. 57.

Velsicol further argues that the testimony of plaintiffs' own expert witness in psychology, Dr. Gary Sarver, also supports its contention that Dr. Conde is not objective. Dr. Sarver testified that Dr. Conde was filed with anger and rage as a result of this litigation. Dr. Sarver's deposition at pp. 83–84..

Cir.1976); *In re Broad Associates Ltd. Partnership*, 110 B.R. 632 (Bankr.D.Conn. 1990). In *Proteus Books, supra*, the Court of Appeals for the Second Circuit held that the trial court's ruling that an employee of the plaintiff could not qualify as an expert because he was an interested party was not "manifestly erroneous." 873 F.2d at 515. In *Yoder Bros., supra*, the court rejected "the isolated self-serving statements of the [defendant's] officers ... [as] not enough to constitute substantial evidence for the jury on the causation issue...." 537 F.2d at 1371. In *Broad Associates, supra*, the bankruptcy court accorded no weight to the opinion testimony of the president of a Chapter 11 debtor's corporate general partner as to estimates of the debtor's cash flow. The court stated that "[a]lthough [the president] is an accountant, no evidence was offered that his opinion was based on an analysis of the potential cash flow of the building. He provided no detail or documentation in support of his naked assertion, and I find that his testimony was lacking in candor, self-serving, speculative, and entitled to no weight." 110 B.R. at 637. Contrary to Velsicol's assertion, these cases do not impose a rigid requirement that parties are not permitted to provide opinion testimony. Rather, in *Yoder Bros.* and *Broad Associates*, the testimony was admitted but accorded little weight or credibility. *Proteus Books* only supports the proposition that a trial court has the discretion to exclude opinion testimony when the expert has an interest in the case. In this Court's experience, employees of a party not infrequently give "expert" testimony at trial.

Plaintiffs cite *Nelco Corp. v. Slater Electric, Inc.*, 80 F.R.D. 411 (E.D.N.Y. 1978) for the proposition that one individual may be an "expert" as to some matters and an "actor" as to others. *Nelco* is a patent infringement case where the court permitted the witness to be deposed as to facts known to him as the co-inventor of the allegedly infringed device but not as an expert retained in anticipation of trial on the issue of infringement. The result in *Nelco* is similar to Magistrate Judge Abel's prior rulings on the discovery dispute, particularly the quoted portions from his December 17, 1991 Order. That Order recognizes that Dr. Conde wears two hats in this case.

Defendants argue that even if Dr. Conde's expert opinions meet the requirements of Rules 702 and 703, the opinions should nevertheless be excluded under Rule 403 because their prejudicial impact outweighs their probative value. Under Rule 403, the Court may exclude otherwise relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice that admission of the evidence would pose. Velsicol argues that the personal attacks on the defendant and its attorneys will cause undue prejudice and confuse the issues before the jury.[8] The cases Velsicol cite in support of its Rule 403 argument are of only marginal relevance in making this decision. For example, Velsicol cites *United States v. McFadyen–Snider*, 552 F.2d 1178, 1182 (6th Cir.1977) which held that evidence that "serve[s] only to cater to the passions of the jury" must be excluded. Examination of that case, however, reveals that the Court of Appeals held that testimony that the defendant was a prostitute and had "sold herself to wealthy men" should have been excluded in a criminal wire fraud prosecution. The other cases cited by Velsicol, also criminal cases, are equally unhelpful when applied to this case.

■■■■■ *Conclusion.* Determinations of the permissible limits of expert testimony is left to the sound discretion of the trial court. *Finch v. Monumental Life Insurance Co.*, 820 F.2d 1426, 1432 (6th Cir. 1987); *United States v. Green*, 548 F.2d 1261, 1268 (6th Cir.1977). "Juries are not as stupid as it pleases some people to be-

8. Defendant identifies statements its counsel elicited from Dr. Conde on deposition cross-examination as indicative of the kind of prejudicial testimony he might give at trial. *See* n. 7, above. It remains to be seen whether plaintiffs will offer such testimony in their case-in-chief at trial. Should defendant choose to elicit such testimony on cross-examination, that would be its trial counsel's tactical decision.

lieve." *General Mills Supply Co. v. SCA Services, Inc.*, 697 F.2d 704, 713 (6th Cir. 1982). It is the province of the jury to weigh the credibility of witnesses, including witnesses testifying as experts. *Coal Resources, Inc. v. Gulf & Western*, 865 F.2d 761, 775 (6th Cir.1989). Thus, although an expert may ostensibly be clothed with the added credibility which inures to experts testifying at trial, juror common sense, cross-examination, argument by the party-opponent's attorneys, the testimony of the party-opponent's own expert witnesses, and a cautionary instruction from the Court, if required, will normally assure that the jury fairly evaluates the expert's testimony.

■ Dr. Conde is plaintiffs' only medical causation expert.[9] He is a family practitioner with no specialized medical training or experience in toxicology, immunology, or any of the other specialties related to the medical causation questions in this case. His testimony does not clearly link his clinical findings and the test results to the medical literature.[10] Dr. Conde has a substantial emotional and economic stake in this lawsuit. His and his family's health is very important to him, and both he and his family have been under great stress as a result of the symptoms and diseases they have experienced over the past nine years.[11] The economic well-being of his family is also at risk. They have abandoned their expensive home, and they have invested substantial monies and energies in prosecuting this lawsuit.

The Court reserves ruling on the admissibility of Dr. Conde's testimony at trial as a medical causation expert but will fully credit his testimony for purposes of ruling on the pending case-dispositive motions.

*Motion by Velsicol* In Limine *to Exclude Opinion Testimony of Peter McConnachie, Ph.D. and Arthur Zahalsky Ph.D.*

Velsicol moves *in limine* to exclude the testimony of two of plaintiffs experts, Drs. McConnachie and Zahalsky, on the grounds that the doctors' proposed opinions are not admissible under Rules 702, 703, and 403, Fed.R.Evid.[12] because their theories of immune system dysregulation are not generally accepted in the relevant scientific and medical communities and would be unduly prejudicial in comparison to their limited probative value. Further, defendant argues that Drs. McConnachie and Zahalsky cannot offer evidence of medical causation because they are not medical doctors and, consequently, cannot make differential diagnoses. Velsicol also argues that their opinions should be excluded because the immune system effects they allegedly measure are not compensable injuries.

Plaintiffs counter that yesterday's scientific skepticism has become today's scientific certainty. They maintain that the fact that there may be a dispute in the scientific community concerning the effects of chlordane on the human body should not be reason to exclude the testimony of Drs. McConnachie and Zahalsky at the pretrial stage.

■ The admissibility of expert testimony is governed by Fed.R.Evid. 702. In

9. In connection with the pending medical causation motions, plaintiffs submitted the July 28, 1992 affidavit of Dr. William R. Adrion. See p. 994, below. Dr. Adrion was not identified as an expert until after the close of the discovery period. Further, he only expresses conclusory opinions about medical causation. The evidence outlined in Dr. Adrion's affidavit could not be relied upon by a jury at trial to demonstrate that chlordane caused the Condes' symptoms and diseases.

10. There is some attempt to do so in his September 22, 1992 affidavit. See, Dr. Conde's September 22, 1992 affidavit, ¶ 8. As the discussion at p. 1008–13 below demonstrates, even this affidavit fails to link the medical and scientific litera-

ture to the Condes' level of exposure to chlordane. Dr. Conde does little more in his September 22, 1992 affidavit than list a number of articles which discuss various medical problems or possible problems related to human (or animal) exposure to chlordane. Neither his testimony nor his affidavit link the findings and conclusions reached in this literature with his family's actual exposure to chlordane, their symptoms, or their disease processes.

11. See Dr. Conde's June 7, 1990 letter attached to his July 31, 1992 affidavit, which is summarized at p. 1006, below.

12. For the full text of these rules, see n.n. 10 and 11, above.

accordance with the provisions of that rule, a four-part test is used to evaluate the admissability of expert testimony. The proponent of expert testimony must demonstrate that (1) the expert is qualified (2) testifying on a proper subject matter (3) which is in conformity to a generally accepted explanatory theory (4) the probative value of which outweighs its prejudicial effect. *United States v. Kozminski*, 821 F.2d 1186, 1194 (6th Cir.1987), *aff'd on other grounds*, 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988); *United States v. Green*, 548 F.2d 1261 (6th Cir. 1977); *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188 (6th Cir.1988).

Velsicol challenges the competency of Drs. McConnachie and Zahalsky to testify based on all four elements of the test set out above. First, Velsicol characterizes plaintiffs' experts as "alchemists," "charlatans," "inept professors," and "phonies." Defendant's July 16, 1992, Reply Statement at 2.

Velsicol also argues that the subject matter upon which plaintiffs' experts seek to testify is not "proper" within the meaning of the four part test outlined above, because subclinical effects (the presence or absence of molecules on the surface of cells), such as immune system dysregulation, is not a compensable injury under Ohio law.

■ *Immune System dysregulation.* In *Sterling, supra*, the court held that expert testimony based on the theory of "clinical ecology" [13] was inadmissible because the American Academy of Allergy and Immunology and the California Medical Association had rejected the theory as an unproven methodology lacking any scientific basis in either fact or theory. In addition, the court noted that although "numerous other professional organizations

and societies, ..., have not discredited the potential usefulness of clinical ecology, few have endorsed either its scientific usefulness or the results of any experiments conducted under the guise of clinical ecology." *Sterling*, 855 F.2d at 1208.

The court in *Sterling* also emphasized the fact that plaintiffs' experts had not conducted tests in support of their conclusions nor had they examined or interviewed the plaintiffs on whose behalf they had testified in the toxic tort litigation arising from the defendant's dumping of hazardous waste which contaminated the local water supply. "Without the requisite clinical tests and a widely accepted medical basis for reaching its conclusions," the court stated, "plaintiffs' expert opinions are insufficient to sustain plaintiffs' burden of proof that the contaminated water damaged their immune system." *Id.* at 1209.

Unlike the experts in *Sterling*, Drs. McConnachie and Zahalsky have conducted tests on the Condes. Plaintiffs assert, without pointing to specific deposition testimony, that one of defendant's own experts, Dr. John Salvaggio, agrees that the types of tests performed by Drs. McConnachie and Zahalsky can measure immune system irregularities. Plaintiffs' Memorandum Contra Velsicol's Motion to Exclude Opinion Testimony of Drs. McConnachie and Zahalsky, at p. 6, citing Depositions of Dr. John Salvaggio.[14] Thus, it appears that a concern of the *Sterling* court, namely, the lack of testing, has been met here. Accordingly, the determinative question becomes whether the theories and methodologies employed by plaintiffs' experts are "generally accepted within the relevant medical community." In connection with Velsicol's motion for summary judgment on medical causation, the Court will ad-

---

**13.** Clinical ecology was described by the court as a theory "premised on a belief that exposure to a number of factors [such as] anxiety, radiation, certain chemicals, and even some common household substances can cause dysregulation of the immune system." *Sterling*, 855 F.2d at 1208.

**14.** Although Dr. Salvaggio acknowledges that immune system panels may assist a physician in

making certain diagnoses, he states they are not generally accepted "as a basis for making statements concerning causality ... [T]hese panels say nothing to the effect that a person might have a disease due to any particular external environmental agent." Dr. John E. Salvaggio's September 12, 1992 affidavit, ¶ 12. Dr. Salvaggio criticizes the methodology used by Drs. McConnachie and Zahalsky. *Id.* ¶ 9.

dress below the issue of whether Drs. McConnachie's and Zahalsky's testimony about immune system dysregulation is sufficient, if credited, for a jury to find that the Condes' exposure to chlordane caused injury to their immune systems.

*Differential diagnosis.* Dr. McConnachie testified during his November 26, 1990 deposition that he is not a medical doctor (Tr. 26). He cannot make medical diagnoses. (Tr. 81.) Only medical doctors can make such diagnoses. (Tr. 181.)

In response to a question asking him whether he was able to give any opinions about whether the Condes have a clinical disease entity, Dr. McConnachie testified: "That's not my job. I am not allowed to do that." (Tr. 162.)

Dr. McConnachie testified that his professional judgment leads him not to "testify about a single individual. I will study them, but I won't testify about them...." (Tr. 413.) He further testified, "I choose not to provide individual opinions. I choose to provide group opinions, because that is how I do the scientific statistical analysis of this work." (Tr. 414.)

However, Dr. McConnachie later testified that he believed Ryan Conde "had a selective IgM deficiency." Dr. McConnachie based this opinion on "[a]n IgM of 440." (Tr. 456.) Dr. McConnachie said that Ryan had "a hypo IgM." He did not know whether there was a specific disease associated with hypo IgM. (Tr. 462.)

Dr. McConnachie expressed the opinion that the Condes have "an autoimmune disease" which "is a form of allergic disease" demonstrated by "sufficient antibody present." (Tr. 470–471.) Since he is not a rheumatologist, Dr. McConnachie cannot testify about whether the Condes have any rheumatic disease. (Tr. 471.) Similarly, he is not an endocrinologist; consequently, he cannot testify whether they have any endocrine disease. (Tr. 472.)

Dr. McConnachie stated that the medical records indicate Rhonda Conde has aplastic anemia. However, he is not a hematologist and cannot testify about whether the Condes have any hematologic disease. (Tr. 473.) For the same reason, "I cannot testify to anything other than I have detected autoantibodies in the Conde family." (Tr. 473.)

Plaintiffs submitted as Attachment 2 to their July 10, 1992 Statement Regarding the Admissibility of Expert Opinion Testimony the unsworn and undated "affidavit" of Dr. McConnachie. It states that he is Director of the Immunotransplant Laboratory at Memorial Medical Center, Southern Illinois University's School of Medicine of Carbondale and Springfield, Illinois and Associate Professor in the Department of Medical Microbiology and Immunology of that Medical School. McConnachie "affidavit" ¶ 1. He performs clinical services involving tissue typing and cross-matching for renal, bone marrow, or pancreas transplants, monitoring the immune status of post-transplant patients, assessing the immune status of patients, and similar duties. *Id.* ¶ 2. Since 1986 part of his laboratory's research has been "devoted to studies of the alterations and abnormalities in immune systems of individuals who have been exposed to various chemicals, including technical chlordane." *Id.* ¶ 3. His work on the immune system has been peer-reviewed and he has presented papers at scientific meetings. *Id.* ¶ 4.

In his November 25, 1991 deposition, Dr. Arthur C. Zahalsky testified that he is not a medical doctor. (Tr. 268.) He cannot provide medical treatment, "but I can certainly correlate the consequences with—that is, the symptoms, if you will, or the consequences with the etiology of those symptoms." (Tr. 59.) He said that physicians rely on his "statements." (Tr. 60.) He has "immunological training in doing it but not medical training." (Tr. 62.) When a doctor comes to him he can rule out a bacterial cause, a viral cause, and so on. *Id.* Nonetheless, he is not a treating physician; and the treating physician must rule out other medical causes. (Tr. 336.)

Plaintiffs have submitted Dr. Zahalsky's July 7, 1992 affidavit which is attached as Exhibit 1 to plaintiffs' July 10, 1992 Statement Regarding the Admissibility of Expert Opinion Testimony. Dr. Zahalsky is a Professor of Immunology in the Depart-

ment of Biological Sciences at Southern Illinois University at Edwardsville, Illinois. He has a doctorate in microbiology. Dr. Zahalsky has testified on the effects of technical chlordane on the human immune system in at least seven cases between 1986 and 1989. Zahalsky's July 7, 1992 affidavit, ¶ 1. He has co-authored a peer-reviewed paper on technical chlordane's effect on the human immune system and presented papers on chlordane at scientific meetings. *Id.* ¶ 4.

Although the Court agrees that Drs. McConnachie and Zahalsky cannot make a clinical diagnosis of medical causation, the Court nonetheless concludes that they have expertise in toxicology and immune system diseases which, within the meaning of Rule 702, Fed.R.Evid., may be helpful to the trier of fact in resolving medical causation issues. Consequently, their test results and their interpretations of those results and the other tests and medical evidence of record are admissible. However, the Court reserves ruling on whether the evidence offered by Drs. McConnachie and Zahalsky is sufficient to create a jury question on the issue of medical causation.

■ *Are the immune defects Drs. McConnachie and Zahalsky identify compensable injuries?* There is substantial reason to doubt that the immune system "abnormalities" identified by Drs. McConnachie and Zahalsky are compensable injuries. Nonetheless, the Court views that question as an evidentiary one for the trier of fact. (The Court's view of the probative value of the testimony is a factor in determining its "helpfulness" under Rule 702.)

*Motion by Velsicol to Strike Improper Rule 56 Material*

Velsicol moves for an order striking from the record four items relied upon by plaintiffs in their opposition to Velsicol's motion for summary judgment on product defect claims, motion *in limine* to exclude the testimony of Dr. Conde and Drs. McConnachie and Zahalsky, and its motion for summary judgment on medical causation issues. The allegedly offending documents are: an article entitled "Corporate Crime:

Why We Cannot Trust Industry–Derived Safety Studies" by Dr. Samuel Epstein ("Epstein Article); the letter to the editor by Dr. Peter F. Infante ("Infante Letter"); the December 22, 1980 Affidavit of Raymond D. Harbison filed in *United States v. Price*, Civ. Action No. 80–4104 ("Harbison Affidavit"); and the April 22, 1990 letter from Joe G. Hollingsworth ("Hollingsworth Letter").

1. The Epstein Article

■ The Epstein Article, entitled "Corporate Crime: Why We Cannot Trust Industry–Derived Safety Studies," appears at 20 *International Journal of Health Services* 443 (1990). The article abstract provides:

The control of pesticides, as of all synthetic chemicals, in most industrialized countries relies heavily or even entirely on safety data supplied by the manufacturers. Such a regulatory system can only be effective if the companies conducting and reporting the studies honestly disclose any adverse findings. The record shows, however, that all too often company executives and their scientists knowingly suppress or manipulate information that could affect the licensing and sale of their products. A case in point is the gross manipulation of health and related data on the pesticides heptachlor and chlordane by the U.S. chemical company, Velsicol.

The article argues that Velsicol has, *inter alia*, failed to publish or misrepresented test data and made false and misleading statements concerning the safety of heptachlor and chlordane. Epstein also asserts Velsicol failed to conduct epidemiological studies concerning residential chlordane/heptachlor exposure. Based on governmental, scientific, and Velsicol's reports and studies, Epstein concludes that it is inappropriate for safety decisions to be influenced by those with a direct economic interest in policy decisions.

Velsicol argues that the article, which it describes as "nothing more than a diatribe against Velsicol," is inadmissible under Rule 56(e). First, Velsicol argues that the

Epstein article does not show that the author had any personal knowledge of the allegations contained in the article. Second, even if the article did allege personal knowledge, Dr. Epstein has not been named as an expert witness and has not been subjected to cross-examination. Third, the document is not attached to an affidavit based upon personal knowledge of any witness.

Plaintiffs argue that the Epstein Article and the Infante Letter (discussed below) are admissible because Dr. Conde refers to both pieces in his affidavit in opposition to Velsicol's Motion for Summary Judgment on Medical Causation. Additionally, plaintiffs argue that the article and letter are admissible under the learned treatise exception to the hearsay rule. Fed.R.Evid. 803(18). That rule provides that statements in learned treatises are not hearsay:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Plaintiffs argue that articles from medical journals are considered learned treatises in this circuit, citing *Ward v. United States*, 838 F.2d 182 (6th Cir.1988). Further, plaintiffs contend the article and letter are relevant because they directly address issues raised by Velsicol in its motions for summary judgment. For example, the Epstein Article refutes Velsicol's assertions that Gold Crest C–100 is not defective and that it was adequately tested. Thus, plaintiffs argue that the materials are probative and should be admitted. Fed.R.Evid. 403. Finally, plaintiffs contend that if the Epstein Article and the Infante Letter are deemed inadmissible, then the unauthenticated studies cited by Velsicol should also be stricken.

In reply, Velsicol argues that Rule 56(e) prohibits consideration of unsworn statements merely because it has been mentioned in an affidavit. Velsicol further argues· that plaintiffs have failed to demonstrate that the Epstein Article is admissible under the learned treatise exception to the hearsay rule.

The Court *concludes* that the Epstein Article is not admissible. First, it does not contain facts relevant to the issues raised by any of the pending case-dispositive motions. Second, there are no "facts" contained in the Article upon which the jury could rely in reaching its conclusions about whether the Condes suffered injuries as a result of their exposure to Velsicol's product. Although the allegations against Velsicol in the Epstein Article are serious ones (and the Court assumes them to be true for purposes of deciding this motion *in limine*), these allegations are not relevant to resolving any of the material issues in this case. Third, Dr. Epstein was not listed as an expert witness and will not testify at the trial of this case. Fourth, plaintiffs have failed to submit an affidavit from an expert relying upon any specific factual assertions in the Epstein Article such that the Article would be admissible under Rule 803(18), Fed.R.Evid.[15]

**2. The Infante Letter**

 The Infante· Letter was published at 29 *Journal of Occupational Medicine* 908 (1987) in the Letter to the Editor section. In the letter, Dr. Infante (and his associate Caroline Freeman) criticizes a chlordane mortality study performed by Shindell and Associates. Velsicol has submitted several Shindell studies relating to mortality of workers at Velsicol's Memphis, Tennessee and Marshall, Illinois chlordane/heptachlor manufacturing plants in support of its contention that human epide-

---

**15.** Plaintiffs' experts do refer to the Epstein Article in their affidavits, but a naked reference which does not tie the substance of the Article to a specific opinion of the expert formed through the use of generally accepted methodologies in the expert's discipline is insufficient to render the Article admissible as substantive evidence under Rule 803(18).

miological studies demonstrate that workers exposed to much higher levels of chlordane than the Condes suffered .no long-lasting adverse health effects.

The Infante Letter asserts that a 1982 National Research Council of the National Academy of Sciences report concluded that the Shindell and Associates data "suggested a significant trend in cancer deaths with duration of employment" contrary to Shindell and Associates (interpretation of the data). Shindell and Urlich then updated the previous follow-up of their cohort of workers exposed to chlordane and reported "there is generally an inverse relationship between cancer mortality and length of employment for cancers overall...." Infante criticizes the published data supporting this conclusion for failing to include the "expected" number of total cancer deaths for each years of employment interval. Infante argues that you would generally expect a larger number of cancer deaths for 0–4 years of employment because of relatively high turnover. 29 Journal of Occupational Medicine at 908.

Infante then corrected the Shindell and Urlich data by estimating an "expected" total number of cancer deaths from labor statistics and comparing the "expected" total number of cancer deaths to the total number of cancer deaths in the Shindell and Urlich Velsicol worker population. As adjusted, Dr. Infante stated that "their data show an almost perfect correlation between length of exposure to chlordane and lung cancer and a significant trend between length of employment and total cancer." *Id.* at 909. Infante criticized Shindell and Urlich for failing to provide "their data not only for the observed, but

also for the expected cancer deaths by length of employment." Such data is normally included in epidemiological studies. *Id.*

Shindell and Urlich replied to this critique of their epidemiologic study, asserting that Infante should have requested the data from them rather than making assumptions about what the "expected" rate of cancers would be. They state that they did include the "expected" rate in their epidemiological study but did not include it in the article "because the editors of this journal requested curtailment of the amount of material submitted and we elected to present the raw data rather than the calculated values." To the Court's non-expert eye, the actual "expected" cancer deaths supplied by Shindell and Urlich are generally close to those assumed by Infante in his criticism of the study.[16] Shindell and Urlich did not directly respond to Infante's claim that there is a correlation between length of employment and increased risk of death by cancer.

Velsicol maintains that, like the Epstein Article, the Infante Letter is inadmissable. Velsicol argues first, that to the extent the letter reflects Infante's opinions as an alleged expert, those opinions are irrelevant because Dr. Infante has not been named as an expert witness in this case and has not been subject to cross-examination.

Defendant Velsicol relies upon the Shindell and Urlich update criticized by Dr. Infante. The Court concludes that Dr. Infante's critique of that study is admissible under Rule 803(18) as evidence tending to undermine Velsicol's assertion that the epi-

16. The Infante table of observed/"expected" cancer deaths uses slightly different years of employment periods than the Shindell table. But the Infante table assumed "expected" numbers of deaths generally appear to be the same numbers as the Shindell "expected" numbers of deaths (total cancers):

| Years Observed | Observed Deaths | | Infante Expected | Shindell Expected |
|---|---|---|---|---|
| 0–4 | 10 | | 16.56 | 17.2 |
| 5–9 | 4 | | 4.2 | 3.9 |
| 10–14 | 6 | | 5.51 | 4.7 |
| 15–19 | 5 | | 4.61 | 3.7 |
| 20 + | 12 | | 9.57 | 11.1 |

Whether the differences between 6 (observed) and 4.7 (expected), 5 and 3.7, and 12 and 11.1

deaths, as the years of employment increase from 10–014, to 15–19, to 20+, is statistically

demiological studies demonstrate that chlordane is not a significant health risk.

### 3. The Harbison Affidavit

. The Harbison Affidavit, filed in *United States v. Price,* No. 80–4104 (D. N.J.), details Dr. Harbison's qualifications as a toxicologist and pharmacologist and discusses the study of toxicological effects on humans and the value of animal studies in predicting the carcinogenic effects of chemicals. The affidavit also discusses the limits of the predictive value of epidemiological studies. Finally, the affidavit discusses in detail the carcinogenic and other health effects of fourteen organic and inorganic compounds. Chlordane is not discussed by Dr. Harbison.

Velsicol argues that the Harbison Affidavit is not based on personal knowledge and Dr. Harbison has not been named as an expert witness. Moreover, Velsicol contends, the Harbison Affidavit is irrelevant to the questions before the Court on medical causation issues.

Plaintiffs assert that the Harbison Affidavit conforms to the requirements on Rule 56(e) and is admissible as an admission by a party opponent. Fed.R.Evid. 801(d)(2).

The Court concludes that the Harbison Affidavit is not admissible here. First, Dr. Harbison was not named as an expert by plaintiff. Second, his affidavit is not an admission by a party opponent within the meaning of Rule 801(d)(2). Third, Dr. Harbison's affidavit is not relevant to any of the central issues in this case. He does express opinions about the use of animal studies in determining whether a chemical poses a cancer risk in humans, Harbison Affidavit ¶¶ 14–16, and expresses the opinion that "epidemiological methods are too insensitive to detect anything but extremely large increases in birth defects (teratagens)." *Id.* ¶ 18. If plaintiffs had wanted to offer Dr. Harbison's testimony on these points, they should have listed him as an expert when disclosing their expert witnesses to Velsicol.

### 4. The Hollingsworth Letter

 The Hollingsworth Letter discusses the Harbison Affidavit concluding that statements made therein are "irreconcilably at odds with testimony ... previously given by Dr. Harbison" in the chlordane/heptachlor litigation. Although the letter is labeled "PRIVILEGED ATTORNEY–CLIENT COMMUNICATION," Velsicol does not assert the attorney-client privilege as a ground for exclusion. Velsicol urges the Court to find that the letter is irrelevant and immaterial to the issues in this litigation because Dr. Harbison has not been retained as an expert witness by either party.

Plaintiffs argue that the Hollingsworth Letter is admissible as an admission of a party opponent.

 Rule 56(e) states that when affidavits are used to support or oppose a motion for summary judgment, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." A motion to strike may be used to direct the Court's attention to questions concerning the admissibility of materials offered in opposition to a motion for summary judgment. *Monroe v. Board of Education of Town of Wolcott, Conn.,* 65 F.R.D. 641, 645 (D.Conn.1975) (citing *Wimberly v. Clark Controller Co.,* 364 F.2d 225, 227 (6th Cir. 1966)). Affidavits may properly be considered only if the material in the affidavit would be admissible at trial. *Midland Engineering Co. v. John A. Hall Construction Co.,* 398 F.Supp. 981, 989 (N.D.Ind. 1975).

The Court concludes that the Hollingsworth Letter is not admissible. It is not relevant to any of the material issues in this case.

*Motion by Velsicol In Limine to Exclude from Evidence the July 1987 EPA Draft Technical Support Document*

 Velsicol moves for an order excluding all evidence, testimony or reference to

significant considering possible sampling errors

is beyond the Court's expertise.

the July 1987 Technical Support Document ("TSD") prepared by EPA on the basis that the document is hearsay. Velsicol further argues that the probative value of the TSD is substantially outweighed by considerations of prejudice and confusion. Plaintiffs assert that the document is admissible under Fed.R.Evid. 803(8).

Fed.R.Evid. 803(8), provides:

The following are not excluded by the hearsay rule, even if the declarant is available as a witness:

. . . . .

**Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

 In order to be admissible under 803(8)(C) [17] a report must first be a set of "factual findings." *Baker v. Elcona Homes Corp.,* 588 F.2d 551 (6th Cir.1978). Velsicol argues that the TSD cannot be considered a "factual finding" because "EPA never undertook an independent factual investigation of the alleged risks of chlordane and heptachlor; instead it simply surveyed and commented on existing data in a way calculated to support most strongly its position in anticipated litigation." Defendant's Memorandum in Support at p. 6. This argument is undermined by the fact that the 1983 EPA report upon which defendant places great confidence similarly does not contain original work of the agency, but also merely surveys and comments on existing data. *See* EPA, *Analysis of the Risks and Benefits of Seven Chemicals Used for Subterranean Termite Control,* (1983) ("1983 EPA Report") ("The summaries of the health effects data are based upon a report ... developed by the National Academy of Sciences, August 1982, as well as other published reviews. Exposure data were taken from the open literature and unpublished data were obtained from the Departments of Air Force, Navy, and Army." *Id.* at I-2; "[I]n most cases the original report was not reviewed by the Agency, but rather the information was obtained from a secondary source." *Id.* at IV-1.) Velsicol has not challenged the studies which underlie the TSD. In fact, as plaintiffs point out, much of the data regarding interior levels of chlordane following treatment was provided by Velsicol as a result of EPA's February 1984 "Data Call-In" notice.

The 1987 TSD "presents EPA's evaluation of the risks and benefits of [chlordane, heptachlor, aldrin and dieldrin] for use on subterranean termites." TSD at i. Velsicol argues that the TSD was prepared by EPA as a precursor to potential litigation over the chlordane and heptachlor registrations and that EPA has repudiated the TSD in litigation in the United States District Court for the District of Columbia between the National Coalition Against the Misuse of Pesticides ("NCAMP") and EPA. The NCAMP litigation was a suit brought by the environmental group challenging provisions of the August 11, 1987 Memorandum of Understanding and voluntary product withdrawal entered into between Velsicol and EPA. The Court has examined the pleadings from the NCAMP litigation submitted by Velsicol and finds that the language quoted by Velsicol in its brief does not appear in those documents. *See* Defendant's Memorandum is Support at p. 3 (citing Defendant's Exhibit B at p. 6); Defendant's Reply Memorandum at p. 2 (citing same). Rather, those documents support plaintiffs' position that the TSD represents

---

**17.** Plaintiffs also argue that the TSD is admissible under Fed.R.Evid. 803(8)(A) and (B). Since the Court concludes that the TSD is admissible under 803(8)(C), it will not consider plaintiffs' arguments for admissibility under 803(8)(A) and (B).

EPA's conclusions regarding the risks and benefits of chlordane termiticide.

John A. Moore, Assistant Administrator for Pesticides and Toxic Substances, EPA, in a pleading entitled "Statement of Reasons" states that the TSD "fairly summarizes the extent of the Agency's knowledge of the hazards (and benefits) posed by chlordane termiticide use...." Statement of Reasons at p. 12 (Defendant's Exhibit C). *See also* Defendant's Exhibit E ("Defendant's (EPA's) Statement of Uncontroverted Material Facts" which sets forth the substance of the TSD as "uncontroverted material facts" in the NCAMP litigation.). Further, the affidavit of William Marcus, Senior Science Advisor and Chief Toxicologist, EPA, states that the TSD represents the Agency's "final conclusions" and is "marked 'draft' not because the conclusions are tentative but because Velsicol agreed to take the product off the market." Marcus Affidavit, Plaintiffs' Exhibit 2, Memorandum Contra Defendant's Motion for Summary Judgment on Product Defect. Velsicol has not addressed any argument to the Marcus Affidavit.

The Advisory Committee Notes to Rule 803 states that the rule "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present." In light of this presumption of admissibility, the party opposing admission of the report must prove that the report is not trustworthy. *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979); *Bank of Lexington & Trust Co. v. Vining–Sparks Securities, Inc.*, 959 F.2d 606, 615 (6th Cir.1992). Here, the Court concludes that both the 1983 EPA Report and the 1987 TSD are admissible under Rule 803(8)(C).

### MEDICAL CAUSATION

Dr. Conde is plaintiffs' sole medical doctor expert causation witness.[18] He has treated himself and his family as their primary physician from April 1983 to the present. Other physicians have also treated plaintiffs, but they will not testify on medical causation. Drs. McConnachie, Zahalsky, and Simon, none of whom are medical doctors, offer expert testimony in the areas of immunology and toxicology.

Velsicol argues that (1) there are no valid human epidemiological studies supporting plaintiffs' claims; (2) even if there is a fact conflict as to valid studies, plaintiffs' experts failed to conduct critical differential diagnoses to rule out other causes of plaintiffs' symptoms; and (3) plaintiffs' theory of causation is not based on a generally accepted explanatory theory and it does not accord with human epidemiological studies.

Under Ohio law, plaintiffs must establish a causal relationship between the tort alleged and the claimed physical injury by the opinion of medical witnesses competent to express such opinions. *Darnell v. Eastman*, 23 Ohio St.2d 13, 16, 261 N.E.2d 114 (1970) ("[T]he issue of causal connection between an injury and a specific subsequent physical disability involves a scientific inquiry and must be established by the opinion of medical witnesses competent to express such opinion"); *Stacey v. Carnegie–Illinois Steel Corp.*, 156 Ohio St. 205, 101 N.E.2d 897 (1951) (syllabus 1); *Yung v. Raymark Industries, Inc.*, 789 F.2d 397, 399 (6th Cir.1986). A series of Sixth Circuit cases indicate that where the expert evidence upon which a plaintiff relies is based on questioned data or a novel scientific explanatory theory, the Court must carefully scrutinize the evidence on causation to determine whether it is sufficient to survive summary judgment and go to the jury. The most recent, and clearest, statement of the Sixth Circuit's position is *Tur-*

---

**18.** Plaintiffs have recently submitted the July 28, 1992 affidavit of Dr. William Adrion, who states plaintiffs' symptoms have been caused by their exposure to chlordane. Dr. Adrion was not disclosed by plaintiffs as an expert until after discovery was completed. Thus, he cannot testify as an expert witness at trial absent a showing that plaintiffs could not with due diligence have identified him as an expert within the discovery period and a determination by the Court that the interests of justice require that plaintiffs be granted leave to add him as an expert witness at trial. The evidentiary value of Dr. Adrion's affidavit will be discussed below.

*pin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349 (6th Cir.1992). Since how the trial court goes about the evaluation of the evidence on causation may well have a determinative impact on the outcome of this motion, the Court will set out the *Turpin* facts and holding in some detail.

First, judges should respect scientific opinion and recognize their own limited scientific knowledge. *Turpin,* 959 F.2d at 1350. In toxic tort cases, the Court must be aware of "the difficulty of scientists and hence of judges, lawyers, and jurors in knowing what reasonable inferences of causation to draw from animal experiments and epidemiological studies" and be mindful of "the uncertainty of judges about how far they should enter the scientific thicket of conflicting inferences in order to determine whether the basis of a scientific opinion concerning causation is sufficiently plausible to allow a jury to ground a verdict on it." 959 F.2d at 1352.

*Turpin* is a Bendectin case. Betty Turpin took Bendectin for morning sickness. Her child, Brandy Turpin, was born with severely deformed hands and feet. The Turpins relied "primarily on animal experiments from which an inference is drawn that since chemical compounds in Bendectin, if administered at certain levels, caused birth defects in animals, they may cause similar defects in humans. The plaintiffs draw a further inference that Bendectin caused the birth defects in this particular case." 959 F.2d at 1350. The treating physicians were unable to diagnose the cause of the birth defects. Merrell Dow relied on epidemiological studies "to show that the incidence of certain birth defects is no higher with women who used Bendectin than with those who did not...." 959 F.2d at 1350–1351.

The Sixth Circuit adopted the "hard look" doctrine, which requires the trial court to make a close judicial analysis of expert causation testimony on summary judgment. 959 F.2d at 1352. Applied to our case, "a hard look" analysis requires the Court to determine "what exactly are the general scientific experiments and stud-

ies capable of showing" whether chlordane caused the Condes' personal injuries. *Id.*

The Sixth Circuit found
close judicial analysis of such technical and specialized matter is necessary not only because of the likelihood of juror misunderstanding, but also because expert witnesses are not necessarily always unbiased scientists. They are paid by one side for their testimony.... [T]he potential for exaggeration and fraud on the court is present and may be impossible to discover without close inspection and careful consideration of the record.
959 F.2d at 1352–1353.

A plaintiff's expert's personal belief or opinion is not sufficient evidence that a chemical caused a personal injury to avoid summary judgment. 959 F.2d at 1360. The expert's testimony must be based "on the collective view of his scientific discipline." *Id.* Alternatively, the expert must explain the grounds for his differences with experts in his or related disciplines. *Id.*

The issues in *Turpin* were how to evaluate epidemiological and animal studies and whether animal studies were sufficient evidence that a chemical caused personal injuries where the epidemiological studies were generally negative. The Court was faced with many conflicting opinions:

The plaintiffs offered expert opinions from ten witnesses in eight scientific fields to assess whether Bendectin is "teratogenic," i.e., capable of causing birth defects. These opinions were based on in vitro and in vivo animal studies, and reassessment of the defendant's epidemiological studies derived from study of humans. In support of its motion for summary judgment, the defendant relies primarily on the 35 human epidemiological studies supporting a finding that the use of Bendectin does not cause birth defects. Some of these studies were conducted by scientists under contract with the defendant. Others were independent.
959 F.2d at 1353.

The *Turpin* Court concluded that the epidemiological studies did not conclusively

demonstrate that Bendectin could not have caused the birth defects. The causes of congenital abnormalities are poorly understood, and the epidemiological studies demonstrate "that it is possible that Bendectin causes birth defects even though these studies do not detect a significant association." 959 F.2d at 1358.

The animal studies demonstrated that when doxylamine succinate, an ingredient of Bendectin, is injected into animal cells, it interferes with cartilage cell formation. However, plaintiffs' expert "can only testify that these chemical compounds connected with Bendectin are 'capable of causing' limb defects in humans, not that they do cause such defects." 959 F.2d at 1358 (footnote omitted). Although plaintiffs offered evidence that subjecting animal cells to high dosages of a chemical and extrapolating the results to humans was an accepted practice, an authoritative treatise stated that relying upon high dosages " 'would eliminate most drugs and many useful chemicals upon which modern society depends heavily.' " 959 F.2d at 1359. While recognizing that animal studies "often comprise the backbone of evidence indicating biological hazards [and that] their legal value has been recognized by federal courts ...," 959 F.2d at 1560, the *Turpin* Court concluded that the animal experiments regarding Bendectin would not "permit a reasonable jury to find that it is more probable than not that the substance causes a similar harm to humans." 959 F.2d at 1559. The Court concluded that plaintiffs' experts "stopped short of testifying that Bendectin more probably than not caused the birth defects ..., because they have no factual or theoretical basis for a stronger hypothesis." 959 F.2d at 1359–1360. The Court concluded that plaintiffs' experts "testified to a possibility rather than a probability." 959 F.2d at 1360.

One expert expressed his opinion that the animal studies and medical records pertaining to Brandy Turpin demonstrated that Bendectin caused her limb defects. In holding that his testimony was unreliable, the Sixth Circuit stated that an expert's testimony must be based "on the collective view of his scientific discipline," 959 F.2d

at 1360, or he must explain the grounds for his differences with other experts in his and related fields. *Id.*

In summarizing its decision upholding the trial court's grant of defendant's motion for summary judgment, the Court of Appeals stated:

Here, the record's explanation of the animal studies is simply inadequate. Although the animal studies themselves may have been scientifically performed, the exact nature of these tests is explained only in general terms. The record fails to make clear why the varying doses of Bendectin or doxylamine succinate given to rats, rabbits and in vitro animal cells would permit a jury to conclude that Bendectin more probably than not causes limb defects in children born to mothers who ingested the drug at prescribed doses during pregnancy. The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issues of human birth defects is too wide. Under such circumstances, a jury should not be asked to speculate on the issue of causation.

959 F.2d at 1360–1361.

When making a determination under Rule 703 about the admissibility of expert testimony, the Court has an obligation to fully develop the record. *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 853–854 (3d Cir.1990). The decision must be made on a "detailed factual record." 916 F.2d at 854. *In re Agent Orange Product Liability Litigation*, 611 F.Supp. 1223, 1239 (E.D.N.Y.1985). Plaintiffs must be given a sufficient opportunity to fully develop and present their case. Here the Court's September 17, 1992 Order, citing *Turpin*, gave the parties another opportunity, after all the briefs on medical causation had been filed, to supplement the record so that all evidence relevant to adjudicating Velsicol's motion for summary judgment would be before the Court.

This is a motion for summary judgment. The Court cannot resolve issues of controverted fact on summary judgment. When resolving questions about the

admissibility of expert testimony, a trial court must avoid merely choosing between expert opinions. *In re Paoli,* 916 F.2d at 853. Doubts about whether the proffered expert evidence would be helpful within the meaning of Rule 703 should be resolved in favor of admissibility.[19] *In re Agent Orange Product Liability Litigation,* 611 F.Supp. at 1267, 1279 (E.D.N.Y.1985).

*Facts related to the determination of whether plaintiffs have made out a* prima facie *case that their exposure to chlordane caused their personal injuries*

Plaintiffs maintain in their August 3, 1992 memorandum contra defendant Velsicol's motion for summary judgment on medical causation that studies on mice, rats, and dogs demonstrate that acute intoxication by chlordane causes symptoms related to the central nervous system and results in liver damage. Plaintiffs cite no studies or testimony supporting this factual assertion in any of their briefs. Dr. Zahalsky states in his September 22, 1992 affidavit, ¶ 5, that, based on animal studies, the USEPA listed chlordane as a "probable human carcinogen."

Plaintiffs further argue in their August 3 memorandum contra that they have identified as expert witnesses Drs. McConnachie and Zahalsky "who have conducted extensive studies into the effects of exposure to chlordane to the human body" and they "have concluded that" the Condes' exposure to chlordane resulted in damage to their immune systems. Plaintiffs also assert that Dr. Robert K. Simon, an analytical chemist and toxicologist, "has extensively studied the toxilogical implications of human exposure to chlordane and its metabolities." Dr. Simon "concludes that exposure to chlordane has caused elevated liver enzymes" in the Conde family. Velsicol responds that plaintiffs have submitted no affidavit(s) to demonstrate that the opinions of Drs. McConnachie and Zahalsky are

based on generally accepted theories.[20] Further, McConnachie and Zahalsky have acknowledged that Stites and Terry's *Basic and Clinical Immunology* (7th ed 1991) is authoritative. It does not support their position, and McConnachie and Zahalsky cite no authoritative text to support their opinions.

*Dr. McConnachie's medical causation testimony.* Plaintiffs attached to their August 3, 1992 memorandum contra Velsicol's motion *in limine* to exclude the opinion testimony of McConnachie and Zahalsky pages 164–178 of Dr. McConnachie's November 26, 1991 deposition and pages 222–223 and 476–477 of his April 25, 1992 deposition. Dr. McConnachie testified that he believes the Condes' immune systems are dysfunctional. (Tr. 164.) Dr. McConnachie believes that 1991 immune system panel test results indicate significant elevations for CD25 and CD26. *Id.* and McConnachie Deposition Exhibit 1. He testified that CD25 is the interleukin–2 receptor on T cells. When the interleukin–2 attaches to the receptor, the T cell activates. This is "part of the proliferative generative response in T cells when an immune system response gets going." The values (apparently CD25) for the Conde family as a whole are "pretty much all elevated. And the p value between them as a group and the control was less than 1 in 10,000." (Tr. 165.) The clinical significance of the 1991 test results is that the Condes' "immune systems are highly activated, turned on. And I think they're turned on to themselves. Autoreactive." *Id.*

Dr. McConnachie explained how the immune system activation he found reflected in the elevated CD25 test results occurred:

.... My premise for this hypothetical discussion is that because of its fat solubility, 1,500 to 1 fat partition coefficient, chlordane is absorbed through the skin, leaves the blood quite rapidly, and ends

---

**19.** In the Sixth Circuit this rule must be applied as the trial judge takes a "hard look" at the scientific evidence on causation as required by *Turpin.* 959 F.2d at 1352.

**20.** In response to the Court's September 17, 1992 Order, plaintiffs submitted affidavits from Drs. Conde, Simon, and Zahalsky addressing various causation issues, including that of whether their opinions are based on generally accepted medical and scientific theories.

up in the bone marrow fat—highest density fat deposition in the body....

.... All the white cells of the immune system originate in the bone marrow, and they pass through the bone marrow on a daily basis when they're mature out of circulation.... The precursor cells for B cells and the precursor cells for the NK cells originate in the bone marrow.

Some start in the liver and get to the bone marrow, but they all get into the bone marrow before they get out of the thymus as a T cell, or to the lymph nodes, or the gut-associated lymph nodes, to the groin lymph nodes, to the inguinal lymph nodes, to the particular epithelial system.

... And on a daily basis circulating cells are going through the bone marrow, some of them, not all of them....

So now we have fat cells with Chlordane and its metabolites and mixtures of compounds of Technical Chlordane sitting in the fat cells of the bone marrow, probably quite innocuously.

. . . . .

So I think, most of the time, they can sit in fat and nothing will happen. Fat doesn't get metabolized very much, very easily, but occasionally it does.

And particularly in children, children that are growing.... But they lose weight for one reason or another. I think that when bone marrow fat gets metabolized there are bursts of Chlordane released ... that will affect the cells traveling through the bone marrow.

And, moreover, those bursts of HAH [Chlordane] will get to the liver because they'll be transported there in the blood. And that's how I can see hepatotoxicity occurring a long time after exposure has finished. Certainly, I can see how bursts of HAH released from bone marrow metabolic activity will cause disarray among the circulating white cells, dysregulation of their functions.

Because these compounds are highly toxic, and here they are sequestered in the bone marrow and released from time to time. Because they are not metabolized at a recognized rate. They don't

biodegrade. They're there. And the only way they get out is when they're excreted when fat cells are metabolized. (Tr. 166–170.)

Dr. McConnachie testified that this scenario assumes "a person who's been exposed to some significant amount of Chlordane." (Tr. 169.) This hypothesis also explains the differences in the CD25 and CD26 values in the 1987 and 1991 tests. (Tr. 170.)

As indicated above, CD25 is the interleukin-2 receptor on T cells. Dr. McConnachie gave the following explanation of the increased appearance of the interleukin-2 receptors:

... I think Chlordane can act as an adjuvant ... and probably can attach to some of the biochemical structures on cell membranes, cell surfaces, and cause the immune system to say, "Ah-ah, there's something different about this cell surface antigen. I now recognize my own self [as] something immune, different, and I'm going to start attacking it."

"And when I start attacking it—" says the immune system—"what do I do first? I release interleukin-2. And when I release interleukin-2 my T cells need to express more sup—" [sic]. They are set up so that, as soon as they see interleukin-2, they are bound to produce more receptors for interleukin-2.

So that's why I think Chlordane causes more CD25 expression. (Tr. 170–172.)

Dr. McConnachie was then cross-examined as to why an elevated CD25 was not found in a study (Deposition Exhibit 1) he conducted. (Tr. 172–173.) Dr. McConnachie responded that CD25 was only tested in 21 of the 27 subjects of the study, and that most of the people in the study were tested a short period of time after their exposure to chlordane. "I think this is a later effect and shows up four years later." (Tr. 173.)

Dr. McConnachie was then asked why the Condes' CD25 was not elevated four years after their initial exposure yet was

seven and a half years after the initial exposure. He responded, "I can't explain that." (Tr. 173–174.)

Dr. McConnachie testified that in the 1991 test the entire family's CD26 was significantly increased. CD26 "measures a molecule on the surface of T cells. Not specifically CD4 or CD8, just CD3 or CD2 T cells. That is a activation molecule." (Tr. 174.) An activation molecule is an "activation marker that seems to be involved with autoimmunity." (Tr. 174–175.) Dr. McConnachie did not know the mechanistic association between the CD26 marker and autoimmunity. He thought it "might be marking a suppressor cell that won't suppress or a helper cell that's helping wrongly. I think it is a marker of dysfunction." (Tr. 176.) Dr. McConnachie testified that the CD26 values for the Condes changed between the 1987 test and the 1991 test because "[t]he form of dysregulation of their immune systems has changed from 1987 to 1991." (Tr. 176.) He could not explain why that change had occurred. (Tr. 177.)

During his April 25, 1992 deposition, Dr. McConnachie testified that three members of the Conde family show the ASM antibodies which are "[i]nappropriate antibodies indicating [that the] immune system [is] not being properly controlled." (Tr. 222.) Further, "the immune system is causing damage when it's producing inappropriate antibodies. . . . They're going somewhere in the body. I'm not sure what the targets really are." (Tr. 222–223.) No antibodies exist without a target. Autoantibodies are bad. They shouldn't be there. (Tr. 223.)

Finally, Dr. McConnachie expressed the opinion that the Condes' complaints of frequent respiratory infections "are due to a dysregulated immune system." (Tr. 477.)

*Dr. Arthur C. Zahalsky's testimony concerning medical causation.* Plaintiffs attached as Exhibit 1 to their August 3, 1992 memorandum contra Velsicol's motion *in limine* to exclude the opinion testimony of McConnachie and Zahalsky parts of Dr. Zahalsky's April 24, 1992 deposition testimony.

Dr. Zahalsky testified that there are "members [of the Conde family] for whom there was evidence of a cryptogenic CAH [cryptogenic active hepatitis] and that that evidence was the evidence presented in two fashions; one, the autoimmunity antibody, and two, the enzyme levels." (Tr. 432.)

Dr. Zahalsky testified that Autumn Conde has chronic active hepatitis and that James P. Conde also "shows evidence of cryptogenic active hepatitis." (Tr. 435–436.) However, Dr. Zahalsky stated that his testimony was based on a "balance of probability whether the values are consistent with a condition that I'm describing as [cryptogenic active hepatitis]. That's the best I can do. . . ." (Tr. 436.) He would not testify to a reasonable degree of scientific certainty that they have cryptogenic active hepatitis. (Tr. 436–437.)

Dr. Zahalsky was asked whether exposure at a level of no higher than one microgram per cubic meter was "high enough to have caused any of the immune system diseases or dysregulations that you are prepared to testify about?" Plaintiffs' counsel objected that that was not a fair question because it assumed that the only exposure was through the air, while chlordane can be ingested and absorbed through the skin just as easily as it can be inhaled from the air. (Tr. 503–504.) Defendant's counsel then rephrased the question:

Assuming . . . that in no case was any air concentration measured higher than one microgram per cubic meter; assuming as well that [ingestion and skin absorption] exposure . . . did occur and that the concentrations on these surfaces were commensurate with values that I have mentioned to you in the air, do you have an opinion that that exposure did cause any of the Condes' immune dysregulation?

(Tr. 505.) Plaintiffs' counsel again objected, stating that the term "commensurate exposure" was not defined. Dr. Zahalsky then answered that there has

[n]ever been a study that correlates any value in the air, wipe samples, food items with what occurs in the bloodstream, . . . [M]y opinion does not rely upon what it is that's in the house; it's what it is that is

contained within the body. So since there has never been a study ... that would test the hypothetical that you've posed, there is no possible answer to your question. Ergo, I rely on what it is that is found in the human being rather than what is found in the house.

(Tr. 505–507.) For those values, Dr. Zahalsky relied upon the Washington Analytical Laboratory Results "showing ... some levels of Transnonachlor in their blood." (Tr. 507–508.) He further testified that his opinion would change if no transnonachlor, heptachlor epoxide or oxychlordan were to be found in their blood. (Tr. 509–510.) [21]

Finally, Dr. Zahalsky agreed that "some antibodies can be made by healthy people without causing disease or signifying a total breakdown of immunoregulation." (Tr. 583.) Plaintiffs do have some form of immune system dysregulation caused by exposure to chlordane. *Id.*

*Dr. Zahalsky's September 22, 1992 affidavit.* In response to the Court's September 17, 1992 Order that plaintiffs' experts make a "systematic statement of their opinions and the grounds upon which they are asserted," Dr. Zahalsky submitted his September 22, 1992 affidavit. September 17, 1992 Order at p. 7. In it, Dr. Zahalsky states that chlordane "is a mixture of similar chemicals and often contains seven different chemical isomers." These chemical isomers and their metabolites are soluble in human fat. Consequently, chlordane accumulates in areas of the human body where there are fat or adipose tissue cells. He states that the bone marrow "is especially vulnerable [to chlordane] because it contains a high percentage of fat...." Chlordane is taken into the body by absorption, inhalation, and ingestion. Zahalsky's September 22, 1992 affidavit ¶ 1.

Much of the chlordane that enters the body is excreted within a short period of time. The biological half life of chlordane is 18–30 days. But Dr. Zahalsky believes that chronic exposure, "even to decreasing quantities, over time, results in the added burden of the body to continue to process, continue to accumulate, continue to excrete and retain these chemical molecules, which penetrate and partition preferentially into the fats and oils of the body—substances which are part of many organs and tissues." *Id.* ¶ 2.

Animal studies have caused the USEPA to list chlordane as a probable human carcinogen. "Toxicologists and other scientists have always relied on animal experiments and such data served as criteria to determine whether human exposure to drugs, food additives, or pesticides is to be permitted." It would be impossible for the government to regulate drugs or chemicals without using animal test data. *Id.* ¶ 5.

Dr. Zahalsky states his opinion that the Condes suffer from a dysregulation of the immune system. *Id.* ¶ 7. He states that the term "immune disorder" defines "any

---

**21.** Because Dr. Simon's Washington Analytical Laboratory, Inc. ("WALI") was not set up or licensed to analyze biological samples, plaintiffs' Admissions Nos. 4–5, Dr. Simon sent the blood samples to American Blood Laboratories, Inc. ("AML"). The AML report, in fact, found no identifiable level of transnonachlor in the Condes' blood. January 8, 1992 deposition of Richard Petrie at pp. 11–14, 20–21. He did quantify the unidentifiable compound because it was "so close to and potentially interfering with" transnonachlor. *Id.* at p. 45. Mr. Petrie did not think the unidentified substance was transnonachlor. *Id.* at p. 46.

The method AML used to analyze the blood samples was gas chromatography. In gas chromatography, the chemist measures the precise time it take molecules of an unknown compound to travel through a long, narrow tube. That time and the chromatogram the molecule produces are then compared with the time molecules of a known compound takes to travel the same path and the chromatogram that molecule produces. See, *Tracor, Inc. v. Hewlett–Packard Co.* 519 F.2d 1288, 1292–1293 (7th Cir.1975); *Vitol Trading S.A. v. SGS Control Services, Inc.,* 680 F.Supp. 559, 561–563 (S.D.N.Y.1987), *rev'd on other grounds,* 874 F.2d 76 (2d Cir.1989).

Here the unidentified substance took between .764 and .767 seconds to elute (travel the path down the tube) compared with the known travel time of transnonachlor of .771 seconds. The chromograph of the unknown substance was broad peaked, Petrie deposition, while the chromograph of transnonachlor is sharp, narrow. Petrie deposition at p. 43. The only two characteristics of molecules traveling the tube is the time it takes (retention time) and the shape of the peaks. Petrie deposition at p. 70. The unknown substance differed from transnonachlor in both characteristics.

symptoms, manifestations, or organ damage to the primary immune system (thymus gland; bone marrow) or secondary immune organs (lymph nodes; spleen; lymph nodes patches of the intestines; immune cells and antibodies)." *Id.* ¶ 6. He states that standard laboratory procedures were used "to test the fluid and cellular components of the circulating blood of the Conde family members...." Dr. Zahalsky further asserts:

> The toxicity of damaging effects of such chemical agents as chlordane are revealed by their action within the primary and secondary immune tissues of the body with the result that alterations in the numbers of immune cells and their function may be detected and quantified by taking samples of blood. Alterations in cell numbers of the various immune cell types and subtypes (e.g. T cells, B cells) defines a dysregulation of the immune system that is described as being abnormal.

*Id.* ¶ 7. Dr. Zahalsky concludes that the immune abnormalities:

> found in members of the Conde family include evidence of damage to (i) the maturation of immune cells that act in the immuno-surveillance functions of our body, (i.e. cells known as natural killer cells identify and eliminate transformed (cancer) cells), (ii) alteration in the ratio of cells that function to control our recognition of self, (iii) abnormal activation (hyper-activation) of immune compartment cells known as T cells, and (iv) deficiency in the production of bone marrow defined or B cells. These and other findings of derangements in the immune cells numbers and functions describe a cluster of abnormalities that reveal both dysregulation and dysfunction in the immune system of the Conde family members.

*Id.* ¶ 8. Dr. Zahalsky also states that Rhonda Conde, Autumn Conde, and James P. Conde "show evidence of autoimmunity." *Id.* ¶ 9.

Dr. Zahalsky states that there is evidence in published scientific and medical literature of the ability of chlordane and its metabolites to cause injury to the human immune system. *Id.* ¶ 10. Additionally, Dr. Zahalsky is conducting a study with Dr. McConnachie of 19 persons about damage to their immune systems caused by exposure to chlordane. *Id.* ¶¶ 11–12. He states that "[t]he immune findings on the Conde family correspond to the cluster of immune abnormalities noted in other families who have been exposed." *Id.* ¶ 13. Dr. Zahalsky concludes his affidavit:

> Based on (1) the data that comes from members of the Conde family, (2) their known exposure as a consequence of misapplication, and (3) our scientific analyses that include other persons that have been exposed to these chemicals (chlordane), my opinion is that the Conde family members have sustained injury to their immune systems that was caused by their chlordane exposure. I believe that the laboratory evidence supports this opinion and that the criteria which exclude other causes have been properly applied, thus leaving chlordane and its various isomers as the most probable damaging chemicals.
>
> Accordingly, my opinion is that chlordane is the proximate cause of the immune injuries sustained by the members of the Conde family based upon a reasonable degree of scientific certainty.

*Id.* ¶ 14.

*Dr. Robert K. Simon's medical causation testimony.* In his November 13, 1991 deposition, Dr. Simon testified that he had no medical school training (Tr. 10, 13). He is not qualified to make a differential medical diagnosis. (Tr. 11.) However, he can "comment on toxicology implications." (Tr. 10–11.) Further, a medical doctor attempting to make a differential diagnosis would consult with a toxicologist. (Tr. 11.) But it is up to the medical doctor to make a diagnosis. (Tr. 12.) The toxicologist "can look at medical data and come to some conclusion as a toxicologist." (Tr. 12.) The practical effect of a toxicologist being unable to make a differential medical diagnosis is that although Dr. Simon can testify that chlordane causes headaches, he cannot testify as an expert about other causes of headaches. (Tr. 12–13.)

Dr. Simon testified that the Condes were exposed at their residence to a "sufficient dose [of chlordane] to exceed the acceptable daily dose intake of those materials just from the air." (Tr. 19.) From his review of the evidence, there were "certainly indications of either spillage of the pesticide or emission of the pesticide from the treatment areas into the basement floor and within various areas of the basement." *Id.* Further, there were "significant contamination air" in the basement "as well as the first and second floor levels.... [T]he upper levels were maybe 50% of the air levels of the basement level." *Id.* Dr. Simon indicated that "one of the SAE reports showed a significant number or virtually all of the items they tested, personal furnishings, toys, clothings, ... were contaminated with chlordane and heptachlor." *Id.*

As to chlordane's effects on the liver, Dr. Simon testified that "the clinical biochemistry records ... are consistent with a response to a compound that causes liver toxicity." (Tr. 108.) The records he has reviewed indicates that the Condes were exposed to chlordane "and all the reported symptomology is consistent with chlordane, heptachlor exposure. And I think the three things tie together that, yes, these folks were exposed to chlordane, heptachlor and have suffered health deficits because of that exposure." *Id.*

Ryan Conde's health deficits include an elevated liver alkaline phosphatase on April 19, 1985 of 236. (Tr. 108.) Dr. Simon testified that it is his opinion that chlordane "could affect alkaline phosphatase." (Tr. 109.) Dr. Simon could not recall during his deposition any articles which showed a correlation between exposures to 1–4 micrograms of chlordane per cubic meter with the elevation of specific liver enzymes. He thought that he would be able to do so. (Tr. 111.) Dr. Simon conceded that liver enzymes could be elevated in response to illness. (Tr. 118.) For example, some viruses can elevate liver enzymes. *Id.* Hepatitis and some over-the-counter medi-

cations can also elevate liver enzymes. (Tr. 119.)

Dr. Simon testified during his November 13, 1991 deposition that the "reported symptoms ... are very consistent with the reported toxic response to chlordane, heptachlor." Ryan's elevated liver enzymes "again are very consistent with that exposure." (Tr. 107.) Dr. Simon testified, "I don't see anything else in the history of this family ... that would be a motivating factor for their health problems other than chlordane, heptachlor." *Id.* Consequently, he "would certainly testify that all the medical files that I have seen are consistent with exposure to compounds like chlordane, heptachlor, and we have documented evidence that that exposure in my opinion did occur" to a reasonable degree of scientific certainty. (Tr. 107–108.) Defendant Velsicol maintains that plaintiffs offer no evidence that "elevated liver enzymes" constituted a disease or illness.

*Dr. Simon's December 5, 1991 environmental assessment of the Condes' home.* Some portion of Dr. Robert K. Simon's January 6, 1992 report on chlordane, heptachlor sampling done at the Condes' home December 5, 1991 have been submitted to the Court. Plaintiffs' Memorandum Contra Property Damage, Exhibit 4.[22] The report indicates that there are standing pools of water in the basement and that water is seeping through the basement concrete block. Presumably the water contains chlordane, heptachlor, since Velsicol's Gold Crest C–100 solution was poured into the concrete block through holes the contractor Mitchell drilled into the block. Air levels of chlordane were apparently below one microgram per cubic meter. Dr. Simon argues in the report:

> Quantitative comparison of the Conde air levels to existing guidelines such as NAS (5 ug/m³ chlordane, 2 ug/m³ heptachlor) and ATSDR (0.5 ug/m³ chlordane) are not relevant for this survey in my opinion. Since the house has not been occupied for several years, most of the TC [technical chlordane] products have settled onto surfaces and into absorptive

22. The report is also an exhibit to Dr. Simon's January 9, 1992 deposition.

materials. The high levels of surface and bulk material TC products indicates that circulating air levels have decreased by absorption of the TC chemicals onto surfaces. It would be anticipated that air levels would increase by an order of magnitude, or more, if occupancy occurred, without removal of all sources of chlordane.

Despite the unoccupied condition of the Conde house, the existence of heptachlor levels, on 120591, and the 0.1–0.2 ug/m³ range, indicates that the maximum acceptable dose level for heptachlor would be exceeded for children and adults, based upon 12 hours of residence time per day, using the dose guidelines of the U.S.E.P.A. 1987 Technical Support Document. The existence of 0.2 ug/m³ TPTC on the first floor indicates that a 50 kilogram person would receive 100% of the maximum acceptable dose level for chlordane, based upon 12 hours of residence time per day, using the dose guidelines of the U.S.E.P.A. 1987 Technical Support Document. The addition of the FPTC components indicates that significantly more than 100% of the maximum acceptable dose of chlordane components would be received daily by a 50 kilogram person.

Thus, air levels found on 120591 indicate that airborne heptachlor and chlordane persist in the Conde house, and would increase significant if occupied under current conditions.

Report at pp. 5–6. Dr. Simon also found chlordane, heptachlor present in wipe samples taken throughout the house. Report pp. 6–7.

Dr. Simon concluded that the Condes' former home "is highly contaminated with heptachlor and technical chlordane components." Report at p. 8. He concluded that the residence "is not fit for human habitation." Report at p. 9. Further, it "cannot be decontaminated, in my opinion, without the potential for significant structural demolition of the basement and crawlspace areas, removal of the HVAC system, and other structural components. It is likely that any demolition-decontamination attempt would be more costly than removal of the entire structure." *Id.*

*James P. Conde's medical causation testimony.* James P. Conde is a doctor of osteopathic medicine. His specialty is family practice. He has no training in toxicology, immunology, epidemiological studies, or the other areas of specialized technical expertise involved in this case. Dr. Conde's July 31, 1992 affidavit, ¶ 1 (Exhibit 1 to plaintiffs' August 3, 1992 memorandum contra Velsicol's motion for summary judgment on issues of medical causation.)

In his November 1, 1991 deposition, Dr. Conde was asked whether he could identify any particular study about chlordane he relied on when he arrived at his opinions concerning medical causation. Dr. Conde responded, "I really don't know at this point. If it's necessary that I provide documentation, then I will. If not, then I'll testify from my own medical perspective on it." (Tr. 28–29.) Defendant's counsel then asked:

> Q. ... [W]ith respect to the problems that you've identified so far [during the deposition] you believe were caused by exposure to chlordane. As we sit here now, can you cite for me any specific study in support of these opinions?
>
> A. Up to this point, I think there is a study by Zahalsky regarding the immune system; however, I don't know the issue, magazine, chapter, page or anything else about that right at this time.
>
> . . . . .
>
> I could try to find the article that I read that there was increased instance of skin carcinomas.[23]

(Tr. 29.)

Later in his deposition, Dr. Conde testified that he felt that one of the family member's urinary incontinence problem "was based on neurogenic problems with

23. Dr. Conde had previously testified that there were studies indicating "an increased susceptibility to skin cancer with chlordane exposure." But he could not name any studies. (Tr. 21.)

Plaintiffs have not provided the Court with copies of any such studies. Defendant argues that Dr. Conde's skin cancer was diagnosed prior to the treatment of the Conde residence.

the bladder, which is based on the neuro-toxicity of chlordane." He said that he did not relate the bladder incontinence to a particular level of chlordane exposure. (Tr. 137.) He was unable to cite any articles showing that chlordane is associated with bladder incontinence. However, he maintained that "[a]ll the studies that state it's neurotoxic" support his diagnosis. (Tr. 136.) Dr. Conde testified that chlordane accumulates in fat cells, the liver, and the brain.

Dr. Conde attributed severe plantars warts on Ryan Conde's heel to a breakdown of his immune system caused by exposure to chlordane. (Tr. 149–151.) He could not cite any specific article supporting this conclusion, although "any treatise on immune systems will imply" immune system breakdowns cause plantars warts. (Tr. 151.)

From his deposition testimony, it was not clear whether Dr. Conde had read any particular epidemiological study. *E.g,.*, (Tr. 31). He did testify that he had read summaries of the epidemiological studies Velsicol relies on, but not the studies themselves. (Tr. 240.)

*Dr. Conde's July 31, 1992 affidavit.* To demonstrate that their symptoms have been caused by their exposure to chlordane, plaintiffs have submitted the July 31, 1992 affidavit of Dr. James P. Conde, which is attached as Exhibit 1 to plaintiffs' August 3, 1992 memorandum contra Velsicol's motion for summary judgment on issues of medical causation. Dr. Conde states that "[w]ithin days of the treatment of the home with chlordane, and continuing until we abandoned the home in 1986, all of the members of our family experienced various signs and symptoms of illness and disease." He attaches his summary of these signs and symptoms for the period 1983–1986 as Exhibit A to his affidavit. Dr. Conde's July 31, 1992 affidavit ¶ 4. For each member of the family, these notes read: [24]

*Kimberly Brooke Conde* Birthdate 1/20/82

1. Had nausea, vomiting, diarrhea & hyperpyrexia 2–3 days after house treated in April 1983. Was hospitalized and treated with IV fluids for dehydration.

2. Has had URI symptoms & bronchitis several times/yr 1983–84–85–86

3. Very poor appetite and eats small amounts only 1984–*85–86*.

4. Abdominal pain—periumbilical and epigastric [with] abdominal bloating, gas & tympany 5–7/wk 1985–86 & worse recently.

5. Diarrhea intermittently 1984–86

6. Stools are frequently loose but formed and generally very pale (acholic) in color; occasionally brown, began in early 1986 to present.

7. Has had staph infection of buttocks & leg—once in 1985 & once 1986. Had staph infection toenail 1986.

8. Has urinary incontinence—dribbles enough to make panties damp & has to change them several times/day. Has not had frank enuresis since shortly after 1 yr old but occ dribbles panties at night also. This has occurred since approximately March, 1986.

9. Intermittent lethargy

10. Abnormal calcification of teeth—under care of Dr. Harold Brown DDS—etiology? No cavities 1984 (?)

11. Nausea & vomiting with fever lasting 1–2 days & occuring [sic] in proximity to similar episodes in other family members approximately one/yr.

12. Rashes—intermittent macular rashes with occasional isolated urticaria especially on neck or abdomen on arms but occasionally on other areas—generally last only briefly & resolve spontaneously; no other symptoms associated except brief pruritus.

13. One episode of sudden flushing and warmth of face—lasted only few hours; no obvious cause. Occured [sic] 1986.

---

24. Dr. Conde's assessment of his own medical condition is not contained in these notes but is separately made in a letter dated June 7, 1990 which is also attached to his July 31, 1992 affidavit. The letter is summarized below at pp. 1006–07.

14. Headache and eyes "hurting" app. 2/wk 1985–86. ?too young to describe when younger.

15. Has occasionally complained of legs & feet "buzzing"—I think she is complaining of parazsthesias [sic]; this lasts briefly; noted app 10–12 times 1985–86. Possibly in hands also.

16. "Hiccoughing" frequently 1985—occasionally 1986.

*Autumn Dawn Conde* Birthdate 8/20/78

1. URI symptoms & bronchitis several times/yr since 1983–86.

2. Good appetite generally but has complained of abdominal pain—generalized but worse in upper abdomen & periumbilical nearly every day & sometimes more than once/day since 1983—worse gradual

3. Has abdominal bloating, gas & tympany frequently—nearly daily. Epigastric pain with eating 1986

4. Has diarrhea sometimes several days in a row and at least several days/wk. Has varied stool color—pale-grey-brown, green, reddish 1983 to present

5. Complains of headaches 1983–84, were less frequent for app. 1 yr and have become more frequent recently.

6. Had staph infection 304/74 1985–86. Has occured [sic] following poison ivy sometimes but 1–2 times without cause.

7. Has had occasional enuresis at irregular intervals approximately 5–6/yr 1984–85.

8. Intermittent lethargy

9. Abnormal calcification of teeth—under care of Dr. Harold Brown DDS—etiology? Has had one cavity.

10. Occasional epistaxis—spontaneous day or nite 1985–86

11. Urinary incontinence and diarrhea at home and school app 10 times/yr 1984–85–86.

12. Otitis external 3–4 times/summer 1985–86

*Ryan Conde* Birthdate 6/5/76

1. URI & bronchitis several times/yr 1983–84–85–86

2. Very frequent thick mucous rhinitis 1984–85–86

3. Generalized abdominal pain with gas, abdominal distention and tympany lasting several hours and occuring [sic] 3–4 times/wk 1983–4–5 and slightly less frequently 1986.

4. Poor appetite 1983–84–85, somewhat improved 1986.

5. Diarrhea approx. twice/month 1983–4–5 and occ. 1986.

6. Headaches frequently 1983–84, occasionally 1985–86.

7. Staph infection buttocks & thighs which required prolonged antibiotics on 3 occasions 1986. Staph infection nose 2–3 times 1985.

8. Hemangioma on neck which I excised 1983. Had been present × several months and enlarging.

9. Complained of feeling "dizzy" occasionally 1983.

10. Abnormal calcification of teeth—under care of Dr. Harold Brown DDS—etiology? No cavities.

11. Interupted [sic] urinary stream with short intervals of flow lasting only few seconds. This occurs primarily on first morning voiding—1984–85–86. Occasionally occurs through night.

12. At time irritable, impatient and highly emotional 1985–86.

13. Seems more forgetful at home & school 1986.

14. Occasional fleeting rashes arms and abdomen 2/month 1983–4–5–6.

15. [sic] Epistaxis worse at night once/month 1983–84.

16. Laryngitis and hoarseness of voice lasting few days 3–4 times 1986 and 1–2 times 1985.

*Rhonda Conde* Birthdate 8/17/52

1. Blurred vision—intermittently 1983. Saw ophthalmologist.

2. Tremor of hands—somewhat present constantly but worse at times—1983–84–85–86. Less in 1985–86.

3. Nausea & vomiting occasionally 1983. Nausea–Stomach pain–84–86.

4. Epigastric pain frequently 1983–84. Some improvement 1985 and more

severe 1986. Had normal UGI 1984 or 85.

5. Night sweats 1983–84.

6. Hands and feet feel cold constantly 1983–4–5–6.

7. Headaches several times/wk 1983–84. Occasionally 1985–86.

8. Abnormal menstrual cycles—longer duration, heavier & cramps 1983–84. Normal pap smears.

9. Epistaxis occasionally 1983–4–5

10. Sudden severe substernal chest pains—lasted 5–10 minutes—occurred 1–2/month at rest & relieved spontaneously—1985–86.

11. Mid & lower thoracic back pain daily and worse on awakening. Relieved when gone from house even 2–4 days.

12. Frequent redness & small urticarial rash arms, neck, abdomen, legs, etc. 2–3 times/wk 1983–84–85–86.

13. Vesicular eruption over sacrum with extreme tenderness 2 episodes—1984 & 1986.

14. Multiple dental problems with root canal, fillings, gingivectomy, etc. 1983–84–85.

15. Parpesthesias occasionally hands & feet 1983–84.

16. Difficulty with memory and concentration 1983.

17. Extremely agitated and irritable [with] emotional instability 1983–84.

18. Occasional low abdominal cramping and gas, occ. sharp low left quadrant pain 1983–84–85–86.

19. Repasted small labial ulcerations during menses 6–8 times/yr 1983–84–85.

20. Occasionally a few peticchyae various areas 1983–84–85–86 and before.

21. Junctional nevus L foot excised by me in late 1983.

22. Epidermal inclusion cysts shoulder, arm, legs 1983–84–85.

23. Fullness in throat frequently 1986.

24. Pharyngitis once/mo 1983–84–85–86.

25. Breast tenderness L > R 1986.

26. Carbuncles chin & shoulders 1–2/mo 1983–84–85–86

27. Wt loss app 17# 1983–84, has regained since

28. Superficial venous varicosities gradually worsening since 1985. External hemorrhoids occ.

29. Inclusion cysts shoulders, legs since end 1983

30. Non-specific myositis & tendinitis various areas frequently 1983–86

Dr. Conde also attached to his July 31, 1992 affidavit a letter dated June 7, 1990 setting out his own medical history. The letter states that from the application of chlordane in April 1983 until the family moved out of their home in November 1986, Dr. Conde experienced:

1) personality changes, 2) difficulty with memory and concentration, 3) chronic sinus congestion [with] rhinitis and cough, 4) profuse nocturnal sweats, 5) general abdominal tenderness with tympany and increased bowel sounds, 6) infectious and lacrimation eyes, 7) recurrent fasciulations of various muscle groups, 8) reddened, periratic rash ____ surface of feet, 9) loss of balance, 10) general lethargy, 11) scaly, dry areas of rash on scalp and right forearm, and 12) irrational and inappropriate behavioral changes.

Since moving out, the following symptoms have persisted:

1) moderate-severe short term memory loss, 2) difficulty with concentration, 3) rhinitis and lacrimation with sneezing frequency, 4) occasional paraesthesias L ulnar nerve distribution, 5) cough, 6) emotional irritability and depression, 6) rare episodes of ocular migraine with visual field disturbance (3 episodes since 1986), 7) occasional episodes of fatigue and lethargy.

In addition, the letter states, Dr. Conde has "developed a serious and persistent emotional distress for both the present and future health implications for myself and my family due to the chlordane poisoning that occured [sic] in our former home." Dr. Conde is

continually pre-occupied with the threat of cancer, blood dyscrocias (leukemia or aplastic anemia), and other serious medi-

cal diseases known to be associated with chronic chlordane poisoning. Besides the health risks, I have been severely distressed by the fact that we are unable to obtain life or health insurance, and our long anticipated plan of raising our children in the home of our choice has been totally disrupted due to this chlordane problem. I have lost faith and trust in people as a result of the deception and lack of responsibility of the people we have had to deal with in this chlordane problem. I also have severe guilt feeling about the amount of time my wife and I have had to spend in dealing with this problem, and the time it has taken us away from our children and each other.

Dr. Conde concludes his June 7, 1990 letter with a self-diagnosis:

> 1) chronic chlordane toxicity with residual effects; 2) elevated body burden-chlordane; 3) immunological suppression 2° to chlordane poisoning; 4) chronic fatigue– 2° physical & emotional factors; 5) chronic depression–2° to multiple problems associated with chlordane poisoning; 6) hypersensitivity reactions (allergic rhinitis); 7) mild schorktoic dermatitis; 8) lipoma L thigh–2° to biofy; 9) basal carcinoma–R chest.

Dr. Conde states that when he and members of his family were presented with these signs and symptoms, he mentally formulated differential diagnoses. *Id.* ¶ 5. He lists the differential diagnoses he has rejected from the following categories of diseases: infectious, metabolic, gastrointestinal, neurologic, psychological, and autoimmune. *Id.* ¶ 6. He also lists the medical tests which have been performed on each member of the family, but not the results of these tests. *Id.* ¶ 7. Each member of the family has undergone extensive testing, including general chemistry screening profiles, autoimmune antibody profiles, chlordane and metabolite blood levels, fat biopsy, viral antibody tests, urinalysis, and X-rays. *Id.* Further, Dr. Conde states in his July 31, 1992 affidavit:

As a result of the concern with chlordane exposure, I have extensively reviewed the medical and scientific literature and consulted appropriate agencies and specialists concerning chlordane. Among these, I have reviewed toxicologic, epidemiologic and critiques of epidemiologic studies among other articles regarding chlordane.

¶ 8. As Exhibit B to his affidavit, Dr. Conde attached a numbered list of 141 articles, pamphlets, press releases, periodicals, and other written sources "I have reviewed concerning the subject of chlordane." *Id.* Dr. Conde also lists 49 persons or groups of persons he has consulted concerning chlordane and his family's medical problems. No specific communications from or to these people are set out in this affidavit.[25] *Id.* ¶ 9.

Dr. Conde then states his opinions on medical causation:

10. Based upon my education, training, medical experience, my review of the medical and scientific literature, and consultations with various specialists and agencies, I have concluded with a reasonable degree of medical certainty that the following medical conditions have been directly caused by my family's exposure to chlordane:

I. Rhonda Conde—(A) Acute and chronic chlordane toxicity with:

1. Immunological Dysfunction
2. Chronic Viremia—secondary to immunological dysfunction
3. Chronic Anxiety—secondary to depressive neurosis (severe)
4. Chronic Hepatic Dysfunction
5. Hematologic Abnormality—lymphocytosis, thrombocytopenia, bone marrow suppression

II. James P. Conde—(A) Acute and chronic chlordane toxicity with:

1. Immunological dysfunction
2. Chronic depressive neurosis (severe)

III. Ryan Conde—(A) Acute and chronic chlordane toxicity with:

---

25. In a September 22, 1992 affidavit, Dr. Conde does summarize communications to him about chlordane and its health effects by some of these sources of information. See pp. 1008–09, below.

1. Immunological dysfunction
2. Liver abnormality—hyperbilirubinemia, hepatosplenomegaly, hepatic toxicity
3. Mild-moderate anxiety/depressive neurosis

IV. Autumn Conde—(A) Acute and chronic toxicity with:
1. Immunologic dysfunction
2. Chronic anxiety/depressive neurosis—(moderate—severe)

V. Kimberly Conde—(A) Acute and chronic chlordane toxicity with:
1. Immunologic dysfunction
2. Mild chronic anxiety neurosis
3. Chlordane

*Id.* ¶ 10. Dr. Conde states that his opinions are based on his medical expertise "and not upon my personal opinions of Velsicol or its counsel." *Id.* ¶ 11. He states that if he were not a plaintiff in this litigation, his conclusions regarding his and his family's medical condition would not change. *Id.* ¶ 12.

*Dr. Conde's September 22, 1992 affidavit.* In response to the Court's September 17 Order, Dr. Conde executed a third affidavit outlining his medical treatment of himself and his family. He summarizes his diagnoses as follows:

1. Acute and chronic chlordane poisoning-all Conde family members (James P., Rhonda, Ryan, Autumn and Kimberly)
2. Immunological dysfunction—All Conde family members
3. Bone marrow suppression—thrombocytopenia-Rhonda
4. Hepatosplenomegaly, Hepatic Dysfunction and Hyperbilirubinemia-Ryan
5. Hepatic Dysfunction-Rhonda
6. Chronic Viremia-Rhonda
7. Severe Anxiety/Depressive Neurosis-Rhonda, Autumn, James P.
8. Mild-moderate Anxiety/Depressive Neurosis-Ryan, Kimberly

Dr. Conde's September 22, 1992 affidavit, ¶ 5. He again states his opinion that these diseases "were directly and proximately caused by the acute and chronic exposure to chlordane which occurred at our residence...." *Id.* In forming his medical opinions, Dr. Conde states, he "relied on a number of different resources, among them were telephone conversations with various medical specialists and scientists with particular knowledge, expertise and experience in toxic exposure in general, and chlordane exposure in particular." *Id.* ¶ 6. He then summarized their communications to him:

a. Mr. David Schneider—Velsicol Chemical Corporation Representative—misapplication of chlordane. He assured me that chlordane was perfectly safe. He advised me to call Dr. Calo, M.D. for further reassurance.

b. Charles J. Calo, M.D.—Director of Toxicology for Velsicol Chemical Corporation—Advised me that chlordane was perfectly safe, that I could remove it by washing with water and detergent, that it was not necessary to close the open holes in cement blocks of foundation, and that there were no health risks. He stated he sprayed it around his camper all the time to kill insects.

c. Dr. Samuel Epstein, M.D.—University of Illinois Medical Center, School of Public Health—Advised that chlordane was dangerous and advised we move from the house to avoid further exposure. Advised me of possibility of immune system damage, leukemia, aplastic anemia, neuroblastomas, liver disease including cancer and felt the symptoms we were experiencing was due to ongoing chlordane poisoning. Advised chlordane could not be removed.

d. Diane Baxter—Toxicologist with NCAMP—Advised to abandon home. Advised of dangers including bone marrow suppression, liver problems, various cancers.

e. Dr. Arthur Zahalsky, Ph.D.—Immunologist and Professor of Immunology—Edwardsville, Illinois—Advised of need for regular monitoring of blood chemistries. Advised complete immunological testing. Advised to abandon home. Advised of health dangers including aplastic anemia, leukemia, liver cancer, immune system damage.

f. Dan Spyker, M.D.—Internal Medicine, University of Virginia—Advised of health effects of chlordane including long-term development of liver cancer, leukemia, bone marrow suppression, neuropsychiatric disability and central nervous system toxicity.

g. Gary Sarver, Ph.D.—Neuropsychologist—Performed neuropsychiatric exams of all family members, advised psychiatric counseling due to varying degrees of clinic anxiety/depressive neurosis associated with the loss of our home and concern over health effects.

h. Ruth Shearer, M.D.—Genetics, Immunology, Genetic Toxicology—Washington—Advised to abandon the home; advised of health effects including liver damage, cancer, bone marrow suppression, central nervous system damage. Also stated that chlordane could initiate genetic changes in chromosomes that could later lead to cancer.

i. Jeanette Sherman, M.D.—Internal Medicine and Hematology—Virginia—Advised of health effects including those listed under #h above with the exception of the genetic changes.

j. Marion Moses, M.D.—Internal Medicine—Mayo Clinic—Minnesota—Same advise [sic] as #c above

. . . . .

Additionally, Dr. Conde states that he has "collected and reviewed numerous medical and scientific articles concerning chlordane exposure and effects." *Id.* ¶ 7. Dr. Conde then listed and abstracted those articles:

a. *Chlordane*—Health Hazard Data Sheet—John Muir Institute for Environmental Studies:

1. Acute Health Effects—"disrupts the function of the nervous system ... acute symptoms include headache, disorientation, apprehension, weakness, muscle twitching ...", "absorbed through the skin."

2. Chronic Health Effects—"chlordane has been reported to cause aplastic anemia in humans." "Chlordane has been show [sic] to cause cancer in rats and mice."

b. *Chlorinated Hydrocarbon Insecticides*—From the W.J. Hayes Textbook: Pesticides Studied in Man by Baltimore, Williams & Wilkins—1982—pp. 229-233:

1. Column one—para. 2—"liver of rats and men have almost identical ability to degrade chlordane...."

2. Col. 1—para. 6—"incidence of hepatoma was increased in mice fed chlordane." This supports diagnosis #7 and partially supports #4 and #5.

c. *Occupational Health Guidelines for Chlordane*—U.S. Dept. of Health and Human Services—8/78:

1. "Chlordane can affect the body if it is inhaled ...," "it may enter the body through the skin."

2. "Chlordane exposure may cause kidney and liver damage. Absorption of chlordane through the skin is rapid and has resulted in death."

3. "Chlordane ... affects the central nervous system ...," "repeated oral administration to rabbits ... autopsy revealed focal neurosis of liver, degenerative changes in kidney, pulmonary exudates and gastrointestinal irritation. In humans, inhalation and skin absorption have resulted in blurred vision, cough, confusion ... ingestion has caused abdominal pain, nausea, vomiting, diarrhea ... tremor, convulsions, and death." The rabbit autopsy findings in (#3) above are identical to the findings of our cat "Jasper" at autopsy.

d. *An Assessment of the Health Risks of Seven Pesticides Used for Termite Control:* Committee on Toxicology ... National Research Council. August, 1982:

1. P. 1, para #3: "the Committee ... concluded that it could not determine a level of exposure to chlordane below which there would be no biologic effect under conditions of prolonged exposure...." [26]

---

**26.** Omitted from Dr. Conde's abstract is the fact that in 1979 the Committee on Toxicology suggested "an interim airborne concentration of 5 ug/m³, which was pragmatically determined on the basis of known concentrations of chlordane in the military housing...." (The study was

2. P. 2, para. 5: Acute or chronic exposure in humans ... can produce central nervous system symptoms characterized by headache, blurred vision, dizziness, involuntary muscle movements, tremors...."[27]

3. P. 5, para. 3: "The four cyclodienes ... exert a toxic effect on the CNS."

4. P. 11, para 4: "Three cases of aplastic anemia and three cases of acute leukemia associated with chlordane exposure were diagnosed...." "Five patients with neuroblastoma and chlordane exposure...."[28]

5. P. 14, para 1 and 2: (Rat) "Toxicity was characterized by liver enlargement and congestion." "Liver damage was observed after 6 weeks, and all mice had died by 16 weeks."

6. P. 15, para 4: "Carcinogenicity data on chlordane ... and found to be carcinogenic in B6C3F1 mice, with a high incidence of hepatocellular carcinoma."

e. *Affidavit of Samuel Epstein, M.D.—* U.S. District Court for District of Columbia—8/17/87:

1. P. 2: My experience relates to the pesticides chlordane ... confirmed the carcinogenicity of these pesticides.

2. P. 4, # 10: "Evidence of neurotoxicity, reproductive toxicity, immune toxicity, and evidence of blood dyscrasias including pancytophehia and leukemia."

3. P. 6, # 13. "Adverse effects from exposure .. including headache, nausea, fatigue, muscle weakness, respiratory irritation, confusion, memory loss and personality changes."

4. P. 6, # 14: "Once a home is contaminated, it is likely to remain so for decades and resist all attempt at decontamination."

5. P. 9, # 18: "... the document gives consumers unwarranted reassurances, such as the claim that chlordane levels below 5 micrograms/m³ do not warrant ... action, when by EPA's own estimates air levels equivalent to or well below these constitute substantial health risks."

．　　　．　　　．　　　．

f. *Massachusetts Dept. of Food and Agriculture—6/12/85*[29]

1. P. 1, #2: "Exposure to chlordane may produce toxicity in the liver and central nervous system of animals and humans."

2. P. 1, # 3: "Chlordane does not (have an antidote)."

**27.** Dr. Conde omits from his abstract the Committee's statement that

[d]ata on chronic exposure at low airborne concentrations are limited. A recent epidemiologic study of workers producing chlordane suggested that exposure has no long-term effects. However, because of shortcomings in the study and the suggestion of a trend in

standard mortality ratios for deaths due to cancer in workers with increasing length of employment, more complete data are needed before firm conclusions can be reached with regard to long-term human-health risks of chlordane and other cyclodienes.

*Id.* at p. 2. The body of the 1982 Assessment states that while acute poisoning produces central nervous system symptoms, "[t]he limited human studies with long-term exposure have not revealed any consistent or significant detrimental effect." *Id.* at p. 10.

**28.** Dr. Conde's abstract omits the Committee's conclusion from these case studies: "No information on a control series is available for comparison, and these case reports provided insufficient information to support conclusions concerning the long-term risks of chlordane." *Id.* at p. 11.

**29.** This document is a press release from the Massachusetts Department of Food and Agriculture announcing a ban on products containing chlordane. It does not contain or cite any human epidemiologic or animal studies.

undertaken because of "reports of the presence of airborne chlordane in military housing long after application...." These houses, built on concrete slabs, were apparently contaminated by chlordane when heating ducts in or below the slabs cracked or when exterminators pierced them as they applied the chlordane.) *Id.* at p. 1. Further, "[a]fter an extensive review of the available literature on chlordane, and in the absence of definitive information on the health risks in humans and animals associated with various degrees of exposure to airborne chlordane," the Committee concluded in 1982 "that there are no new data that justify a change in the guideline of 5 ug/m³...." *Id.* at p. 6. The Committee emphasized this was an interim guideline to be used only until new data was available. *Id.*

g. *Estimated Resident Deaths Due to Chlordane in Virginia*—1976–1985—by Dr. Dan Spyker, M.D.—38 deaths were estimated.[30]

h. *Affidavit* [31] *of Brian Dolan, M.D.*—U.S. District Court for the District of Columbia:

1. P. 2, # 4: "Acute effects include abnormal liver function, CNS dysfunction including tremor, inco-ordination, seizures and death. Of more concern are the chronic effects."

2. P. 2, # 5 and P. 3 # 5: "In ... Journal of the American Medical Association ... chlordane was noted to be associated with aplastic anemia, thrombocytopenia, agranulocytosis ..." "More recent work has demonstrated defects in the human immune system with chlordane/heptachlor exposure."

i. *Acute Chlordane Poisoning:* Archives of Environmental Health—Vol. 18, February, 1969:

"20 month old drank unknown quantity of chlordane." "At noon he vomited." "The body temperature ... rose to 102° F."

j. *Affidavit* [32] *of David Ozonoff, M.D.*—U.S. District Court for the District of Columbia:

1. P. 3, para 1: "Noted in the Journal of the American Medical Association that chlordane and heptachlor were some of the most hazardous pesticides then in use ... It is my opinion that ... chlordane and heptachlor pose an imminent hazard to consumers ... by virtue of their toxicity to bone marrow ... dysregulation or damage to the immune system.

2. P. 4, para 1: "These studies are consistent with reports of carcinogenic effects demonstrated in animal bioassays of chlordane and heptachlor."

k. *You and Your Immune System:* National Foundation for the Chemically Sensitive:

1. P. 5, Col. 2, para. 4: "We have also studied exposures to chlordane both on acute exposure and a long-term exposure. These patients ... showed changes of immune activation and auto-immunity."

1. *Carcinogenicity of Heptachlor and Chlordane*—By Samuel Epstein 1976 in ... Total Environment pp. 103–154:

1. Summarizes independent reviews for EPA of several studies (IRDC, NCI, Kettering Labs) performed under contract to Velsicol Chemical Corporation. In each instance the Velsicol findings of benign liver modules were found to be malignant hepatic tumors when the same slides were reviewed by independent pathologists.[33]

m. *Chlordane:* In text Disposition of Drugs and Chemicals in Man by Randal C. Baselt:

1. Column 1, para 4: "Chlordane is a ... central nervous system stimulant ... Chronic exposure is known to cause liver and kidney damage."

2. Column 2, para 1: "Several cases of chronic poisoning have been reported in which the victims had monocytic leukemia or megaloblastic anemia."

n. *Corporate Crime—Why We Cannot Trust Industry—Derived Safety Studies*—by Samuel Epstein, M.D. in International Journal of Health Services—Vol. 20, # 3, 1990:

Summarizes Velsicol Chemical Corporation's failure to test, failure to publish test data, misrepresentation of test data,

---

30. This is a page excerpted from an unidentified document. It apparently purports to attribute deaths to chlordane based "on calculated excess in exposed populations typically reported as a Standardized Mortality Ratio ..." and on an extrapolation from unidentified data based on chlordane contamination of Air Force housing and "air samples from living areas in New York...."

31. The copy of the affidavit provided this Court is not executed. The last page of the document, following the body of the "affidavit" and his curriculum vitae, contains no writing other than an undated declaration under penalty of perjury signed by Dr. Dolan.

32. The copy of the affidavit provided this Court is not executed by Dr. Ozonoff.

33. These were animal studies (mice and rats) reviewed by the U.S. EPA when it was deciding whether to ban DDT. *Id.* at pp. 150, 153.

ignoring of expert warnings, false and misleading statements, failure to warn and describes Velsicol's conduct as "white-collar crime."

o. *Lung Cancer and Other Causes of Death Among Licensed Pesticide Applicators*—by Blair, et al., in JNCI Vol. 71, No. 4, July 1983:

1. Abstract—"excess deaths were reported for leukemia ... and cancers of the brain and lung." [34]

p. *Poisoning by the Insecticide Chlordane*—In the Medical Journal of Australia by R. Barnes:

1. Case study of 47 year old man: "Chronic exposure to chlordane who had tingling sensation in right hand" and later "twitching of the hand ... up to the right arm ..." "spread to involve the right foot ... and twitching of the facial muscles." Later he "had a convulsive seizure...." He "ceased using chlordane ... he suffered no further fits." [35]

q. *The Carcinogenicity of Organ Chlorine Pesticides*—by Samuel S. Epstein, pp. 243–252:

1. P. 247—"The epidemiologic aspects of these studies have been reviewed by leading national experts and they unanimously agree that the number of workers ... were inadequate for the development of valid inferences...." [36]

r. *Chlordane:* In Clinical Toxicology of Commercial Products by Gasselin, Smith and Hodge, 1986:

1. P. III—108, col., para. 2: "It is rapidly absorbed through the skin and may be more toxic by this route than by oral administration."

2. P. III—108, col. 1, para. 4: "Once absorbed, chlordane is an extremely persistent poison.

3. P. III—108, col. 2, para. 2: "Appearance of blood dyscrasia...." "Three cases of aplastic anemia associated with chlordane exposure."

4. P. III—108, col. 2, para 3: "Chronic poisoning in animals produces inanition and degenerative changes in the liver, renal tubular, lungs, internal submucosa and heart."

5. P. III—108, col. 2, para. 4: "Chlordane is an established carcinogen in mouse liver."

6. P. III—109, col. 1, para. 1: "Three human cases of leukemia and five cases of neuroblastoma in children." [37]

s. *Environmental Impact Statement ... Chlordane*—by N.Y. State Dept. of Environmental Conservation—February 1986 [38]:

1. Summary p. XI–XVII—This summarizes known effects of chlordane on the liver, central nervous system, reproductive and immune systems. It details chlordane's persistence in biological systems and states that there is [sic] no safe levels and that it bioaccumulates in the environment.

---

34. Dr. Conde's abstract omits the following caution on interpreting this finding:

 [S]tudy limitations such as use of the general population for comparison, lack of information on smoking habits, and the paucity of data on type and intensity of pesticide exposures must be considered in interpreting these results.

 *Id.* at p. 35. The authors concluded:

 In summary, the excess mortality from lung cancer among pesticide applicators is consistent with the limited results available from other epidemiologic studies. These findings, coupled with the tumorigenicity of some pesticides in laboratory animals and the potential for widespread exposure among the general public, underscore the need for further research to clarify the carcinogenic risks of pesticides.

 *Id.* at p. 36.

35. The patient worked in a nursery which used DDT and chlordane. Although careful when applying the chlordane, he had dermal contact with it by handling seed-bed soil on an almost daily basis. *Id.* at p. 972, coll. 2.

36. This quotation refers to studies made from 1968–1973.

37. The full sentence reads: "Exposure to chlordane formulations has been implicated in the development of three human cases of leukemia and five cases of neuroblastoma in children (Infante, *et al.,* 1978)."

38. This is a draft environmental statement on amendments to 6 NY CRR Part 326 relating to the restriction of cyclodiene pesticides, including chlordane and heptachlor.

2. P. 107—"Hepatic enzyme induction from the chlordane." [39]

3. P. 108—Chronic Human Health Effects: "Headache, general malaise, loss of appetite, loss of weight." [40]

4. P. 111—"There was a statistically significant positive trend in standard mortality ratios for cancer deaths as length of employment increased." [41]

5. P. 112—" ... the relationship between prenatal and postnatal chlordane exposure and the occurrence of neuroblastoma, aplastic anemia, and leukemia." [42]

*Id.* ¶ 8.

Dr. Conde also states his opinion that animal studies "are reliable, useful and valid methods of predicting the effects that various chemical substances will have in humans," especially in "defining substances which are carcinogenic." *Id.* ¶ 9. He states that "it is very difficult for me to relate" the epidemiological studies relied on by Velsicol "to my patient group," because those studies "have concentrated on worker exposures...." *Id.* ¶ 10.

*Dr. Richard Irons' September 23, 1992 affidavit.* In response to the Court's September 17, 1992 Order that the parties supplement the record with evidence about generally accepted opinion and methodology within the medical/scientific community, Velsicol submitted the September 23, 1992 affidavit of Dr. Richard Irons, a toxicologist. Dr. Irons' affidavit sets out his opinions on a number of topics which will be separately summarized below.

*Methodologies used by medical/scientific communities.* In evaluating whether a chemical causes medical symptoms, the medical/scientific communities consider human epidemiologic studies, acute case studies, anecdotal case reports, animal studies, and government regulatory documents. Dr. Irons' September 23, 1992 affidavit, ¶ 5. However, "[i]t is generally accepted within the medical/scientific community that, in the absence of positive epidemiologic studies that prove that a given chemical cause a specific adverse health effect, a scientist cannot opine to a reasonable degree of scientific certainty that that chemical does cause that particular adverse health effect, *i.e.*, cannot prove medical causation." *Id.* ¶ 7. Further, members of the medical/scientific communities hold the generally accepted opinion "that repeated, negative epidemiologic studies constitute evidence tending to prove that the chemical at issue, at *or below* the exposures involved, does not cause adverse health effects." *Id.* ¶ 8 (emphasis in the original). Acute case studies involving patients who have ingested a large amount of a known chemical "may be relied upon to support an opinion that similarly massive ingestions or absorptions, followed immediately by the same palpable symptoms in a later patient, caused the observed effects, *id.* ¶ 9; but anecdotal case reports—"in which the existence or degree of exposure is unknown or vague, symptoms are self-reported...." —are generally accepted in the medical/scientific community as, "at best, suggestive only." *Id.* ¶ 10.

Animal studies "are frequently relied upon by the government for purposes of regulation and standard setting," but they are "not generally accepted within the medical/scientific community as presenting a basis for an opinion on human medical causation...." *Id.* ¶ 11. Animals in studies are exposed to the test substance for most of their lives at doses hundreds or thou-

---

**39.** This language is not found on page 107, which includes material discussing acute, life threatening chlordane poisoning.

**40.** These symptoms are from "[f]requent multiple exposures" which "may result in chronic poisoning (Micks, 1954)." *Id.*

**41.** This is an interpretation of the Shindell and Associates 1981 study of Velsicol workers who are exposed to chlordane and heptachlor in their employment.

**42.** The full sentence reads: "Infante *et al.* (1978) examined the relationship between prenatal and postnatal chlordane exposure and the occurrence of neuroblastoma, aplastic anemia and leukemia." *Id.* at pp. 112–113. The study cited found that 5 of 14 children diagnosed as having neuroblastoma at a pediatric hospital from December 1974 to February 1976 "had had either prenatal or postnatal home exposure to chlordane." *Id.*

sands of times higher than those experienced by humans. *Id.* Consequently, "the scientific and medical communities would *not* rely upon animal studies ... solely as a basis for rendering opinions that a particular chemical caused a particular adverse health effect in a human being." *Id.* ¶ 12 (emphasis in original). Dr. Irons opines that the medical/scientific community would not rely on the 1987 TSD because it relies heavily on animal studies and was not peer reviewed. *Id.* ¶ 13.

*Fundamentals of toxicology.* A fundamental principle is "the dose makes the poison." Given a large enough dose, "every substance known to man can be toxic...." Dr. Irons' September 23, 1992 affidavit, ¶ 14. There is a "threshold" dose for every chemical and every adverse health effect." *Id* ¶ 15.

Dr. Irons' review of the medical/scientific literature about chlordane convinces him "that workers exposed to chlordane and its related compounds in occupational exposures absorb a dose well *below* the threshold doses necessary to cause adverse human health effects." *Id.* ¶ 16. Acute case studies show that very high doses of chlordane may cause death. Such doses stimulate the central nervous system and can lead to tremors and convulsions. "[U]nless death results, the patient soon recovers and does not have continuing adverse health effects." *Id.* ¶ 17.

*Human epidemiology studies of exposure to chlordane.* In paragraph 19 of his affidavit, pages 12–25, Dr. Irons abstracts 19 human epidemiology studies of exposure to chlordane. He concludes that these studies "demonstrate that at exposures to chlordane and related compounds of 500 micrograms per cubic meter ("ug/m$^3$") and higher, the human body does not absorb a sufficient dose to cause any known adverse human health effects." *Id.* ¶ 20 (footnote omitted). He acknowledges that Dr. Infante has criticized one epidemiologic study. While not conceding the merits of Dr. Infante's critique, Dr. Irons states that "the medical and scientific communities look at the pattern of these studies taken as a whole. That pattern convincingly demonstrates that exposure to chlordane, at the levels reflected in these studies, does not cause adverse human health effects...." *Id.* ¶ 21.

*Comparing the Condes' exposure with occupational exposure.* Dr. Irons reviewed the relevant test data and reports concerning chlordane levels in the Condes' home. Dr. Irons' September 23, 1992 affidavit, ¶¶ 22–23. The November 19, 1984 Bruce Menkel tests (four air samples, NIOSH Method § 278) averaged 0.74 ug/m$^3$ inside the house, with the highest being 1.02 ug/m$^3$. The only reading from the living areas showed chlordane/cubic volume air of 0.09 ug/m$^3$. *Id.* ¶ 23, n. 5.

In December 1987 S.E.A. took eight air samples. The five from the living areas averaged 1.2 ug/m$^3$ of chlordane with a range of 0–1.8 ug/m$^3$. Three samples from non-living areas (basement and garage) had an average concentration of 2.2 ug/m$^3$, with a range of 0–4.4 ug/m$^3$ *Id.* ¶ 23, n. 5. The December 5, 1991 WALI tests involved eight air samples. The average concentration of chlordane was 0.46 ug/m$^3$. Five samples from living areas (excluding basement and garage) had an average concentration of 0.40 ug/m$^3$. The highest concentration within the house was 0.96 ug/m$^3$ (at the bottom of the basement stairs). *Id.*

OSHA set a Permissible Exposure Level ("PEL") of 500 ug/m$^3$ for a worker exposed to chlordane eight hours each working day, 50 weeks a year, for a working lifetime. *Id.* ¶ 19, page 25 at n. 4. Dr. Irons concludes that assuming a worst case exposure of 0.96 ug/m$^3$ throughout the house, the Condes' exposure "was only 1/500th of the exposure levels experienced by the workers examined in the epidemiologic studies" given the PEL of 500 ug/m$^3$. *Id.* ¶¶ 25–26.

*Critique of bulk/wipe sample evidence.* Bulk samples are concentrations "given in terms of weight of chlordane per unit of weight sample." *Id.* ¶ 28. Wipe samples are "concentration given in terms of weight of chlordane per unit area surface." *Id.* So-called bulk-wipe samples give "the weight of chlordane found *within* certain

bulk samples per unit area of the surface of such sample." *Id.* (emphasis in the original). In Dr. Irons' opinion, the WALI bulk, wipe, and bulk-wipe samples data do not alter the ⅟₅₀₀th exposure comparison between the Condes and the workers who were subjects of the epidemiologic studies Velsicol relies on, since the workers' dermal exposure and ingestion "would have been just as much of a factor as they might have been for the Condes...." *Id.* Even when the Condes' 24–hour exposure versus the workers' 8–hour exposure and a child's body weight versus an adult's is taken into account, the Condes' exposure is hundreds of times lower than workers exposed at the 500 ug/m³ PEL. *Id.*

*Evidence about the presence of chlordane is the Condes' body tissues or fluids.* Dr. Irons states that the Condes "have not shown the presence in their bodies of chlordane or any related compound above that which is typically found in the population as a whole." *Id.* ¶ 29. The U.S. EPA's 1982 National Adipose Tissue Survey Specimens reported that "the majority of Americans has residual stores (or metabolites) of chlordane in their fat. None of the Condes has any chlordane in his or her fat or other tissue." Similarly, the 1986 American Medical Laboratory's analysis of each of the Condes' blood found that any chlordane or "chlordane metabolite was *below* minimal detection limits of 0.5 parts per billion." *Id.*

*Dr. John E. Salvaggio's September 22, 1992 declaration under penalty of perjury.* In response to the Court's September 17 Order, Dr. John E. Salvaggio, a physician and clinical immunologist, executed a September 22, 1992 declaration under penalty of perjury. He discusses *Dr. McConnachie's immune system panels* and their relevance to the medical causation issues in this case.

Dr. McConnachie performed immune system panels of each of the Condes in early 1987 and again in late 1991. A comparison

of the results of the two panels show that those "results are strikingly dissimilar." Dr. Salvaggio's September 22, 1992 declaration, ¶ 7. Dr. Salvaggio states that immune system panels "are not generally accepted by the medical and scientific communities as bases for making clinical diagnoses in cases such as the Condes." *Id.* ¶ 8. First, the evaluation of immune system parameters is still experimental.[43] Second, the accepted use is to evaluate patients who have opportunistic infections. Third, the reference range for the panels is such that there is a significant chance a normal person will have one or more test "abnormalities." Fourth, many common drugs and viruses may result in test "abnormalities." *Id.* ¶ 9. Immune system panels should not be used on patients who present with vague symptoms. *Id.* Dr. Salvaggio is further of the opinion that the 67% reference range adopted by Dr. McConnachie is not generally acceptable for immunological testing (95% is recommended). *Id.*

Dr. Salvaggio further asserts that "there is no support in the medical community for the existence of the disease 'immune system dysregulation'...." *Id.* ¶ 10. The medical and scientific communities "do not rely upon 'immune system panels' as a basis for making statements concerning causality.... [T]hese panels say nothing to the effect that a person might have a disease due to any particular external environmental agent." *Id.* ¶ 12. Dr. Salvaggio criticizes the panels as only giving a snapshot of those elements of the immune systems (2% of the cellular components) present in the blood supply at the time the blood sample is drawn. *Id.* ¶ 14.

Dr. Salvaggio states that only a medical doctor can determine the presence of immune system disease after a clinical examination and a review of the patient's records. *Id.* ¶ 15. Dr. Salvaggio found no evidence of any immune system disease in the Condes' medical records. *Id.* ¶ 16.

---

**43.** The experimental nature of the tests is demonstrated by Dr. McConnachie's reading of the 1987 test results as demonstrating a serious deficiency in NK cell function, yet once sufficient data was collected he re-analyzed the 1987 test results and concluded that the Condes' NK function was within a normal range. *Id.* ¶ 11.

The immune system panels are interpreted by Drs. McConnachie and Zahalsky to show the presence of autoantibodies in the blood. Dr. Salvaggio states:

The presence of autoantibodies in the blood of three of the Condes does not mean that any of them are sick or ever will get sick. Most human beings produce autoantibodies at some level.... In some cases, extremely high 'titers' or concentrations of these autoantibodies are associated with particular diseases.... In the case of the three Condes, ... the levels of autoantibodies are generally so close to the 'normal' range that they can hardly be described as 'abnormal.' The medical and scientific communities would not rely upon these autoantibody levels as a basis for saying that the Condes have a disease, particularly because none of the Condes has a clinical diagnosis of an autoimmune disease."

*Id.* ¶ 17. To the contrary, the presence of autoantibodies in their blood is evidence the Condes' immune systems are in good health. *Id.* ¶ 18.

Finally, Dr. Salvaggio notes that the Condes have "never contracted any of the diseases characteristic of a depressed immune system. Instead, any viral problems they may have had are due to garden-variety viruses, bacteria, and fungi...." *Id.* ¶ 19. There is no evidence that the Condes have a higher rate of infectious disease than the general population. *Id.* Based on the epidemiological literature on chlordane and assuming the Condes' exposure "in the low parts per billion," it is Dr. Salvaggio's "opinion that exposure to chlordane could not and did not cause any of the alleged health effects about which" they complain. *Id.* ¶ 21.

*July 28, 1992 affidavit of Dr. William R. Adrion.* Dr. Adrion, a family practitioner with training in toxicology, reports that he has reviewed unspecified medical records of Rhonda Conde, James P. Conde, Autumn Conde, Ryan Conde, and Kimberly Conde. Dr. Adrion states:

It is my medical opinion as a toxicologist, that the symptomology and exposure

that the family was subjected to by the insecticide chlordane was such to cause the symptoms and conditions as described in the medical records and as substantiated by the information within the medical records as reviewed.

Adrion's July 28, 1992 affidavit, ¶ 4.

Defendant argues that the Court should not consider Dr. Adrion's affidavit in ruling on the pending motions. Dr. Adrion was not identified as an expert witness by plaintiffs during the discovery period. Consequently, defendant had no opportunity to depose or take other discovery from him. Even if the Court were to consider the affidavit, it is not sufficient under Rule 56(e) to create a genuine issue of material fact. The affidavit fails to reveal (1) the medical records Dr. Adrion reviewed; (2) the exposure levels he assumes; (3) which symptoms/complaints support his diagnoses; and (4) what, if any, scientific or medical literature concerning chlordane serves as a basis for his opinion. The Court will not consider Dr. Adrion's conclusory affidation in connection with the pending motions.

*Medical causation: outline of the positions of the parties.*

Velsicol advances two main lines of argument supporting its motion for summary judgment on medical causation. First, given the medical record in this case, plaintiffs cannot prove that their exposure to chlordane caused their physical injuries unless they can produce evidence of human epidemiological studies demonstrating that exposure to chlordane at levels averaging one microgram per cubic meter (1 ug/m³) caused those kinds of physical injuries. Second, plaintiffs cannot prove that their exposure to chlordane caused their physical injuries unless they can offer admissible evidence from a medical doctor that their exposure to chlordane caused their physical injuries; and, defendant maintains, Dr. Conde cannot offer such evidence because his bias prohibits him from testifying as a medical witness on his own behalf (and on behalf of his family) and that, in any event, his testimony does not meet the evidentiary and substantive standards necessary under

Fed.R.Evid. 702 and 703 to qualify him to testify as an expert on medical causation.

Velsicol argues that none of the studies referred to by Drs. McConnachie, Zahalsky and Simon in their depositions or affidavits have properly been placed in the record before the Court.[44] Velsicol acknowledges that Exhibit B to Dr. Conde's July 31, 1992 affidavit lists a string of items he has reviewed in reaching his medical opinions; however, he does not have any expertise in toxicology and he was unable to discuss any of these studies during his deposition.[45]

Defendant suggests that the Court may disregard an expert's later opinion when it is contradicted by his earlier sworn testimony. *See, Davidson & Jones Development Co. v. Elmore Development Co.,* 921 F.2d 1343, 1352 (6th Cir.1991), *citing, Gagne v. Northwestern National Insurance Co.,* 881 F.2d 309, 315 (6th Cir.1989); *Laborers' Pension Trust Fund v. Weinberger Homes,* 872 F.2d 702 (6th Cir.1988).

*Plaintiffs' prima facie case of medical causation: plaintiffs' legal argument.* Plaintiffs argue that the level of proof of medical causation required at trial does not rise to the level of certainty that may be required by the scientific community. The United States Court of Appeals for the Third Circuit admonished in *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 957 (3d Cir.1990), that, in making a determination under Fed.R.Evid. 703 about whether expert testimony would be helpful, the trial judge must remember:

> The fact that a scientific community may require a particular level of assurance for its own purposes before it will regard a null hypothesis as disproven does not necessarily mean the expert opinion with somewhat less assurance is not sufficiently reliable to be helpful in the context of civil litigation.

(Footnote omitted.) Similarly, the Court in *Wells v. Ortho Pharmaceutical Corp.,* 788 F.2d 741, 745 (11th Cir.1986) held that the plaintiffs' burden of proving that birth defects were caused by defendant's spermatocide "did not necessarily require them to produce scientific studies showing a statistically significant association between spermatocide and congenital malformations in a large population," because "[i]t does not matter ... that the medical community might require more research and evidence before conclusively resolving the questions."

Plaintiffs also argue that *In re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829 (3d Cir.1990) supports their position that they have presented sufficient evidence of a *prima facie* case of medical causation to avoid summary judgment. In that case, Dr. Zahalsky was a witness. The Court of Appeals reversed the District Court's exclusion of his testimony, holding that the trial court's insistence on a certain kind of degree qualification for experts was improper. 916 F.2d at 855. There is no requirement that an expert's opinion be peer-reviewed and published in the professional literature. 916 F.2d at 858.[46]

Plaintiffs also cite *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1535–1536 (D.C.Cir.1984), which held:

> [A] cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical.

How to evaluate experts' testimony about epidemiological studies was the cen-

---

**44.** Since the briefs were filed, the parties have submitted additional affidavits and documents which have cured this deficiency.

**45.** Dr. Conde's subsequently filed September 22, 1992 affidavit does abstract articles about chlordane. See pp. 1009–13, above.

**46.** Nonetheless, plaintiffs note, Drs. McConnachie and Zahalsky have published peer-reviewed articles in professional journals.

tral issue in *DeLuca, supra,* a Bendectin birth defects case. The Court pointed out that the only direct causation testimony was that the baby's mother took Bendectin during the time her limbs were developing in the fetus. Otherwise, plaintiffs relied on inferences drawn from epidemiological studies. 911 F.2d at 945. Epidemiological studies require a null hypothesis against which the data is checked. The Court stated that "the key null hypothesis would be that there is no association between Bendectin exposure and an increase in limb reduction defects." *Id.* So that as in *Turpin,* the battleground in *DeLuca* was: what are the generally accepted medical/scientific methodologies for analyzing epidemiological data and forming opinions on causation.

The *DeLuca* Court recognized "the potential for abuse that exists whenever an expert is permitted to testify to an opinion that is based upon reasoning and data that have not been subjected to the review of professional colleagues." 911 F.2d at 952. Nonetheless, the Court held that there is no requirement in Fed.R.Evid. 703 that an expert adopt the same conclusions as the authors of the studies he relies on or that he subject his own analysis to peer review. 911 F.2d at 954. The Third Circuit did conclude that Fed.R.Evid. 702 permits the exclusion of expert testimony which is based upon unreliable methodology. *Id.*

The *DeLuca* Court held that Fed.R.Evid. 703's requirements are normally met "if an expert avers that his testimony is based upon data experts in the field rely upon...." 911 F.2d at 952. The Court noted that Rule 703 "was designed to broaden and liberalize the permissible bases for expert testimony." 911 F.2d at 952–953. The *DeLuca* Court rejected the "general acceptance" test of admissibility, holding that an expert's "opinion cannot be excluded simply because the weight of scientific opinion leans against him." 911 F.2d at 955. Nonetheless, "the degree to which contrary opinion dominates the relevant literature is not wholly irrelevant to the reliability inquiry...." *Id.*

An assessment of the reliability of expert testimony under Fed.R.Evid. 702 "should be conducted with an eye to all the risks of error posed by the proffered evidence." *Id.* (footnote omitted). While acknowledging that "the assessment of reliability implicates what risk or what type of error the judicial system is willing to tolerate," the Third Circuit concluded that the balance tipped toward "admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process." 911 F.2d at 955–956 (footnote omitted). The Court of Appeals remanded the case to the trial court to determine whether plaintiffs' expert's testimony was sufficiently reliable to be helpful to the trier of fact. 911 F.2d at 956–957.

*In re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829, above, is also a toxic tort case. The Court held that there are two separate circumstances which require the exclusion of expert testimony under Rule 702: (1) the witness is unqualified to give expert testimony in a particular field and (2) the witness is qualified to give expert testimony in a particular field but bases his opinion on an unreliable scientific technique. 916 F.2d at 855. The trial court excluded much of Dr. Zahalsky's testimony about the effect of PCPs on human beings because he is not trained in differential diagnosis. *Id.* The Court of Appeals noted that Dr. Zahalsky has a Ph.D. in microbiology and teaches courses in immunology and human diseases. 916 F.2d at 855–856. It concluded:

> In light of the liberal Rule 702 expert qualification standard, we hold that the district court abused its discretion in excluding portions of [Dr. Zahalsky's] testimony simply because [he] did not have the degree or training which the district court apparently thought would be most appropriate.

*Id.* (Footnote omitted.) The *In re Paoli* defendant also criticized the scientific data and/or method of Dr. Zahalsky. The Court of Appeals recognized that "[t]hese attacks are forceful, and we cannot say, at this point, that they are without merit." 916 F.2d at 859. But it remanded the Fed.

R.Evid. Rules 702 and 703 questions to the trial court for consideration on a fully developed record in light of the proper legal standard. *Id.*

The *In re Paoli* Court indicated that an expert's opinion is not "helpful" within the meaning of 702 unless its reliability is more than that required to meet the standard of " 'bare logical relevance.' " 916 F.2d at 857. Nonetheless, the Third Circuit believed that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." *Id.* A trial court "in making reliability determinations ... must err on the side of admission rather than exclusion." *Id.* The reliability inquiry is multi-factored and flexible. *Id.* (Finally, the Court of Appeals held that the pretrial exclusion of expert testimony under Fed.R.Evid. 403 should be rare. 916 F.2d at 859.)

In *Wells*, 788 F.2d 741, above, the plaintiffs offered three qualified toxicology experts, including two physicians who had examined them. 788 F.2d at 744, n. 5. These experts cited and discussed six studies. 788 F.2d at 744 n. 6 and 745 n. 7. The Court of Appeals concluded that several of the epidemiological studies indicated an association between use of the spermatocide and birth defects. 788 F.2d at 744.

 Plaintiffs further argue that a witness does not necessarily have to be a medical doctor to testify about causation. *Villari v. Terminix International, Inc.*, 692 F.Supp. 568, 573 (E.D.Pa.1988); *Rubanick v. Witco Chemical Corp.*, 242 N.J.Super. 36, 576 A.2d 4, 9, 14 (A.D.1990) (biochemist with 37 years in cancer research allowed to testify to cause of plaintiff's decedent's cancer). Under Fed. R.Evid. 702, an expert is qualified to testify if " 'his knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in the writing of the truth.' " *Mannino v. International Manufacturing Co.*, 650 F.2d 846, 850–851 (6th Cir.1981), quoting *United States v. Barker*, 553 F.2d 1013 (6th Cir.1977). Finally, plaintiffs argue that it is the jury's function to weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct.

2505, 2513, 91 L.Ed.2d 202 (1985). A trial court should trust the jury to perform that function and not substitute its judgment on the reliability of the medical causation testimony where plaintiffs demonstrate that their experts are at least minimally qualified and give testimony which may help the jury in resolving the ultimate issues of fact.

*No valid epidemiologic evidence.* Defendant argues that the valid epidemiological studies establish that exposure to chlordane at concentrations hundreds of times higher than those alleged here does not cause adverse effects on human health. Plaintiffs respond that workers with acute intoxication by chlordane report the same *CNS symptoms* experienced by the Condes. Additionally, studies on mice, rats, and dogs demonstrate exposure to chlordane results in liver damage.

Defendant argues that Drs. McConnachie and Zahalsky do not have the expertise to express an opinion that plaintiffs' medical problems were caused by their alleged exposure to chlordane. Further, neither could cite any peer-reviewed literature supporting a causal connection between chlordane and any of plaintiffs' health complaints. Nor do they cite valid epidemiologic studies.

Plaintiffs respond that Drs. McConnachie and Zahalsky are "expert immunologists ... who have conducted extensive study into the effect of exposure to chlordane on the human body." Plaintiffs' July 10 Brief at p. 6. They also argue that scientific certainty is not required to go to the jury. *DeLuca*, 911 F.2d at 957.

Velsicol argues that because Dr. Simon is not a physician, he has an inadequate scientific basis to opine that plaintiffs suffered adverse liver enzymes as a result of their alleged exposure to chlordane. Dr. Simon is unable to cite any scientific or medical articles to show such effects in human beings from exposure to chlordane. Plaintiffs reply that human epidemiological studies are not required. *Ferebee v. Chevron Chemical Co.*, 736 F.2d at 1535. *See Sterling*, 855 F.2d at 1198–1201.

Velsicol maintains that Dr. Conde is unable to cite any study in the scientific literature supporting his causation opinions. During his deposition he claimed there are studies demonstrating that chlordane is neurotoxic, regardless of the level of exposure, but he could not name any such study. Further, he testified he had not seen studies defendant relies on which demonstrate that exposure in amounts hundreds or thousands of times higher than those measured in the Condes' home were not associated with adverse health effects in humans. Plaintiffs respond that they experienced nausea, headaches, and diarrhea (symptoms associated with chlordane exposure) following the application of chlordane to their home, and those acute symptoms subsided when they moved from their newly constructed home. Dr. Conde's September 22, 1992 affidavit does list people he talked with about toxic exposure and a synopsis of the information they communicated to him, ¶ 6, as well as articles he has read and his summary of their contents. ¶ 8. See pp. 1008–13, above. However, the opinions attributed to the professionals he talked with are conclusory and are not evidence of facts which, if credited by a jury, might establish a causal relationship between the Condes' exposure to chlordane and their diseases or symptoms of diseases. His recitation of articles he has read and considered in making his diagnoses is inconsistent with his deposition testimony, see pp. 1003–04 above, which clearly demonstrates that at the time he submitted to deposition as an expert, demanding an expert's fee, he was unprepared to testify about the medical or other specialized literature he relied on, if any, in making those diagnoses. Setting that aside, none of the literature he cites supports his diagnoses that exposure to chlordane at the levels measured at his residence caused the symptoms reported by Dr. Conde and his family. For example, items like the John Muir Health Hazard Data Sheet or the Epstein Affidavit, Dr. Conde's September 22, 1992 affidavit, ¶ 8(a), (e), are conclusory and do not contain facts upon which a jury could base a finding of medical causation. Other synopses of articles do not indicate that the doses referred to in those articles are comparable to the doses the Condes were exposed to. *Id.* ¶ 8(b), (c), (d), (f), (g), (h), (i), (j), (k), (*l*), (m), (*o*), (p), (r), and (s). The remaining articles do not contain factual information relevant to a diagnosis. *Id.* ¶ 8(n), (q).

*Failure to conduct differential diagnosis.* Velsicol argues that Drs. McConnachie and Zahalsky are not qualified to make a medical differential diagnosis and Dr. Conde failed to do so. Plaintiffs reply that medical training in differential diagnosis is not required. *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d above at pp. 855–856 (reversing trial court's exclusion of Dr. Zahalsky's testimony on the ground he lacked training in differential diagnosis); *Villari v. Terminix International, Inc.*, 692 F.Supp. 568 (E.D.Pa.1988) (permitting two Ph.D.s to testify concerning termiticide's medical causation of personal injuries). Plaintiffs further assert Dr. Conde did make a differential diagnosis. Dr. Conde's November 1, 1991 deposition at pp. 106–120. Dr. Conde's September 22, 1992 affidavit, ¶¶ 4, 11; Dr. Conde's August 3, 1992 affidavit, ¶ 3.

*Defendant's epidemiological studies.* In its medical causation brief, Velsicol points to ten epidemiological studies which it argues demonstrate that exposure to trace levels of chlordane in a residential setting cannot cause the ill effects alleged by plaintiffs. Defendant's reading of these and other epidemiological studies set out in Dr. Richard Irons' September 23, 1992 affidavit, ¶ 19, is that the subjects of these studies were exposed to levels of chlordane hundreds of times higher than any levels measured in the Conde home. Yet, defendant asserts, the subjects of the studies did not suffer adverse health effects related to chlordane exposure. *Id.* ¶ 21.

Further, Velsicol argues that the opinions of Drs. McConnachie and Zahalsky are insufficient to establish plaintiffs' burden of proof. First, Velsicol observes that Drs. McConnachie and Zahalsky cannot identify any reference in the peer-reviewed medical and scientific literature which supports a causal connection between chlordane expo-

sure at the levels measured in the Conde's home and any of plaintiffs' health complaints, citing McConnachie November 29, 1991 Deposition at 45 [47]; Zahalsky November 25, 1991 deposition at 254–255.[48] Velsicol also argues that Dr. Simon similarly cannot cite any epidemiological study correlating chlordane exposure at those levels to adverse health affects in the form of adverse liver enzymes, citing Simon November 13, 1991 Deposition at 111.[49] Moreover, defendant notes that Dr. Simon admitted that similar effects on liver enzymes can be caused by medications, viruses and common solvents. Finally Velsicol asserts that Dr. Conde cannot cite relevant medical or scientific studies to support his causation theories.

Plaintiffs respond that epidemiological studies are not required to prove causation, citing *Ferebee v. Chevron Chemical Corp.*, 736 F.2d 1529 (5th Cir.1984); *Sterling*, 855 F.2d 1188–1191. They also maintain that the Epstein Article and Infante Letter show how Velsicol's epidemiological studies are invalid.

Plaintiffs maintain they have proffered a *prima facie* case of medical causation. Plaintiffs argue that Dr. Conde has concluded, after extensive investigation, that his family's exposure to chlordane has caused acute and chronic chlordane toxicity with immune system implications. to all members of the Conde family, blood and neurological implications to Rhonda Conde, and liver abnormalities in Ryan Conde. Dr. Conde's opinions are supported by Dr. William Adrion, the current Franklin County coroner, who holds a Masters Degree in Biochemistry and Toxicology.[50]

Plaintiffs also rely on the deposition testimony and affidavits of Drs. McConnachie

and Zahalsky that the Condes' immune systems have been damaged. Additionally, Dr. Simon has concluded, based on his studies, that the Conde family's exposure to chlordane has caused elevated liver enzymes in family members. Finally, plaintiffs argue that the 1987 TSD concludes that chlordane is capable of causing liver damage.

Plaintiffs rely on *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d at 952; *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d at 745; *Ferebee v. Chevron*, 736 F.2d at 1535–1536; and *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d at 857 for the proposition that medical certainty is not required to prove legal causation.

## CONCLUSIONS OF LAW ON MEDICAL CAUSATION

After a careful review of the evidence submitted by plaintiffs, the Court concludes they have offered no expert medical causation evidence from which a jury could conclude by a preponderance of the evidence that the Condes suffered personal injuries (disease or illness) as a result of their exposure to chlordane. To be admissible at trial, expert opinion testimony must be either

· based on the collective view of the experts' medical or scientific disciplines

or

· based on data gained from their use of accepted medical or scientific methodologies (and the experts must explain the grounds for their differences of opinion with experts in their or related disciplines).

*Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d at 1360. *Sterling v. Velsicol*

---

**47.** Dr. McConnachie testified that he believes that somewhere in the literature there is evidence of chlordane's toxicity to humans, "but I can't find it anywhere."

**48.** Dr. Zahalsky testified he could not identify any scientific literature which shows an association between exposure to chlordane and chronic active hepatitis.

**49.** Dr. Simon said he could not recall any such literature, although he argued that if you look

beyond reports and articles to the supporting data there was support for his position.

**50.** Defendant Velsicol challenges the admissibility of Dr. Adrion's Affidavit because he has not been previously identified as an expert witness by plaintiffs. The Court has excluded Dr. Adrion's affidavit from consideration in connection with the pending case-dispositive motions. See p. 1016, above.

*Chemical Corp.,* 855 F.2d at 1209; *Ferebee v. Chevron Chemical Co.,* 736 F.2d at 1535–1536; *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d at 952. Principles or methodologies are "generally accepted" when they are "sufficiently established to have gained wide acceptance in the field to which [they] belong." *Sterling v. Velsicol Chemical Corp.,* 855 F.2d at 1208. Both alternative avenues of qualification as an expert will be discussed separately below.

*Based on the collective view of the medical and scientific communities.* The evidence of record is uncontroverted that. the collective view of medical doctors, toxicologists, and immunologists is that there is no proven causal relation between exposure to chlordane at the levels experienced by the Condes and the symptoms and diseases suffered by them. Plaintiffs' experts argue forcibly that there is, in fact, such a connection; and they believe that the Condes' symptoms and diseases were and are caused by their exposure to Velsicol's Gold Crest C–100. Nonetheless, plaintiffs' experts do not maintain that their view that long-term residential exposure to relatively low doses of chlordane can cause central nervous system symptoms, liver disease, immune system dysregulation, psychological symptoms, and so on is the collective view of the medical, toxicologic, and immunologic communities. (And even if they did so argue, there is no evidentiary support for that position in the record.)

This conclusion does not mean that no causal relationship, in fact, exists between residential exposure to chlordane at the levels experienced by the Condes and the symptoms and diseases suffered by them. Mainstream medical and scientific opinion can be, and has not infrequently in the past been, proven wrong. The Court merely holds that plaintiffs' experts' testimony is not admissible under the first prong of the test for admitting expert opinion testimony: that the opinion be based on the collective view of the experts' medical or scientific disciplines.

*Based on the use of accepted medical or scientific methodologies (with explana-* *tion of the grounds for their differences of opinion with experts in their or related disciplines* ). Plaintiffs have offered no evidence from which a jury could conclude, based on the opinions of Dr. Conde that the symptoms he and his family suffered (and continue to suffer) were caused by their chronic, low dosage exposure to chlordane in their home from April 1983 until early November 1986, that Velsicol injured the Condes. The Court accepts as true (accurate) all of the factual assertions in Dr. Conde's deposition testimony and his three affidavits. During the time they lived in their chlordane-treated home and continuing to the present, the Condes have suffered the physical and mental symptoms and diseases listed by Dr. Conde. He has been unable to reach any other diagnosis as to etiology except to relate these symptoms and diseases chronologically to the application of Velsicol's termiticide to their home and to the lessening of symptoms (particularly those relating to the central nervous system) once they abandoned their home. Relying on his reading of animal studies, governmental regulatory agency documents about the dangers of chlordane, and the test results and opinions of Drs. McConnachie, Zahalsky, and Simon, Dr. Conde has concluded that his and his family's exposure to chlordane caused their symptoms and diseases.

The Court will discuss the evidence of Drs. McConnachie, Zahalsky, and Simon below. Focusing only on Dr. Conde's expert testimony, the Court recognizes his qualifications as an osteopathic family practitioner. The Court fully accepts for purposes of this decision and will consider admissible as expert testimony at trial his opinion that, excluding exposure to chlordane, he finds no other medical cause(s) for the symptoms and diseases he has *identified.*

Dr. Conde's affidavits set out the symptoms he and his family have, the articles he had read about chlordane, and his diagnoses. The critical deficiency in his testimony is that he does not connect the symptoms with the literature (and the general body of medical knowledge), nor does he connect the symptoms and the literature related to those particular symptoms with

his specific diagnosis. In short, his proposed expert testimony does not include the kind of connected, systematic analysis of symptoms, findings on clinical examination, relevant medical knowledge from the literature, and resulting diagnosis which is required to prove medical causation. He has failed to demonstrate that he has used the accepted methodologies of the medical profession, immunology, or toxicology in forming his opinions on medical causation.

The heart of his medical causation opinion is that:

1. He is unable to make a diagnosis of the medical cause of his and his family's symptoms and diseases.

2. Chlordane was applied to their residence in April 1983.

3. Their symptoms first presented shortly thereafter.

4. They moved out of the residence in early November 1986.

5. Their symptoms diminished thereafter.

A logical hypothesis is that their symptoms were caused by their exposure to chlordane. But the above evidence of medical causation standing alone is not sufficient to go to the jury. There must be medical evidence of causation. *Darnell v. Eastman*, 23 Ohio St.2d at 16, 261 N.E.2d 114 and the other cases discussed at pp. 994–95, 261 N.E.2d 114, above. Evidence indistinguishable to that outlined above was presented by the plaintiffs in *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d at 1350. Betty Turpin took Bendectin during the seventh week of her pregnancy. The fetus's fingers and toes initially develop some four to eight weeks after conception. Brandy Turpin was born with severely deformed hands and feet. Her mother took no other drugs during her pregnancy, and the defects could not be traced to any known genetic disorders. *Id.* Nonetheless, the *Turpin* court held that this evidence was insufficient to prove that Bendectin caused the birth defects, and that

plaintiffs must proffer medical causation testimony which meets one of the two prongs of the test for the admissibility of expert testimony if they are to avoid summary judgment on medical causation. 959 F.2d at 1360.

Dr. Conde's belief as a medical practitioner that their exposure to chlordane caused their symptoms and diseases is not enough to tip the balance. *Turpin*, 959 F.2d at 1360. He states that he formed that belief based on:

1. His reading of the literature on chlordane.

2. The tests administered and/or evaluated by Drs. McConnachie, Zahalsky, and Simon.

3. The opinions of Drs. McConnachie, Zahalsky, and Simon.

The Court will now consider whether one or more of these bases for his opinions raise them above mere belief.

*Literature on chlordane.* Dr. Conde's reading of the literature on chlordane as presented to the Court is an insufficient basis to support his opinion on medical causation. As discussed at p. 1020 above, Dr. conde does not connect specific findings or generally accepted opinions in the professional literature to specific symptoms the Condes have suffered and to his diagnoses. Instead he abstracts a number of conclusions from epidemiologic and animal studies and a number of opinions on the toxicology of chlordane. See pp. 1009–13, above. He also lists symptoms (some of which are mentioned in his abstracts), and he makes diagnoses (some of which are for diseases mentioned in his abstracts). But nowhere does he tie these three "lists" (article abstracts/Condes' symptoms/Condes' diagnoses) together.[51]

The toxicity of a substance is dose specific. It is not a medical or scientific methodology to lump together without explanation of acute exposure case studies, worker exposure studies, animal studies, excerpts

---

51. In ¶ 8 of his September 22, 1992 affidavit Dr. Conde does summarily state that a particular animal study supports several of his diagnoses, but he does not explain why. He also indicates that rabbit autopsy findings "are identical to the

findings of our cat 'Jasper' at autopsy." *Id.* None of the abstracts of the literature on chlordane he has read is otherwise tied to symptoms, clinical findings, test results, or diagnoses.

from standard medical references, and regulatory agency pamphlets, and then to assert without further analysis that these studies and other information about the toxicity of chlordane "caused" the Condes' symptoms and diseases. Moreover, when an expert expresses an opinion which is not generally accepted within the medical and scientific communities, he has an obligation to provide a reasoned explanation of why his methodology and opinions differ from those representing the collective view of the relevant medical or scientific disciplines. *Turpin*, 959 F.2d at 1360. Dr. Conde has failed to give such an explanation. Dr. Conde also refers to literature about persons exposed to large doses of chlordane who suffer acute central nervous system symptoms. Plaintiffs also have suffered CNS symptoms. However, there are no studies of long-term, low dose exposure which indicate a correlation between that exposure and CNS symptoms. It is not a generally accepted medical or scientific methodology for Dr. Conde to rely on that literature to establish that his and his family's exposure to chlordane caused their CNS symptoms.

Consequently, for the reasons set out above, the Court concludes that Dr. Conde's reliance on the literature about chlordane does not raise his testimony above the level of an expression of opinion insufficient to avoid summary judgment.

■ *Tests administered and/or explained by Drs. Mcconnachie, Zahalsky, and Simon.* The use of tests generally accepted by the medical and/or scientific communities as a basis for forming causation opinions may qualify a witness to testify as an expert. *Ferebee v. Chevron*

*Chemical Co.*, 736 F.2d at 1535–1536. Here plaintiffs' experts relied on Dr. McConnachie's 1987 and 1991 immune system panels and a 1986 WALI blood test as interpreted by Dr. Simon.[52] These tests will be discussed separately below.

*Immune system panels.* For the reasons discussed above at pp. 1015–16, the Court concludes that the 1987 and 1991 immune system panels are experimental and not generally accepted by the medical or scientific communities as a methodology for making a determination of medical causation under the facts and circumstances of this case. This Court is not in a position to say whether immune system panel will in the future be a recognized tool for determining whether exposure to a chemical caused damage to a patient's immune system. That is not the question before the Court.

Drs. McConnachie and Zahalsky believe in the helpfulness of immune system panels in detecting damage to the immune system. Their belief may be justified, but the technique is not presently considered sufficiently reliable by the medical and scientific communities to permit reliance on it in this case. Moreover, even if the Court were to assume injury to the Condes' immune systems, the immune system panels themselves are not capable of identifying the *cause* of that damage.[53]

*1986 Washington Analytic Laboratory (WALI) blood tests: transnonachlor.* Chlordane or its metabolites has never been found in the Condes' blood or tissue. Dr. Simon reported that the 1986 WALI gas chromatography of the Condes' blood samples demonstrated the presence of "ap-

---

**52.** Other standard tests were also administered various members of the Conde family. For example, Rhonda Conde had blood tests in connection with her treatment for anemia and Ryan Conde underwent extensive testing for his liver problems. Although these tests confirmed the presence of certain diseases, they are not relied on by plaintiffs' experts to prove that chlordane caused those diseases. Instead, they rely on the literature about chlordane and the tests set out in the body of this Opinion to prove medical causation for diseases confirmed by routine medical testing.

**53.** Dr. McConnachie offers a *possible* explanatory theory in his testimony, see pp. 997–99, but it is not based on the test's ability to detect chlordane as the cause, but his own conjecture. Similarly, Dr. Zahalsky's testimony and affidavit, see pp. 999–1002, above, offer the opinion that the immune system dysregulation he believes confirmed by the tests is caused by the Condes' exposure to chlordane, but the tests themselves cannot confirm chlordane as the cause. The bases for Drs. McConnachie's and Zahalsky's opinions on medical causation are discussed below.

parent" transnonachlor in their blood. However, Dr. Simon did not conduct the gas chromatography tests. AML did; and AML reported no detectible transnonachlor, chlordane, or other chlordane metabolites in their blood. See p. 1000, above, at n. 21 and p. 1015. Those results, and AML's interpretation of them are controlling, and plaintiffs now acknowledge that "Dr. Simon has never opined that the results of the blood tests *were in fact* transnonachlor...." Plaintiffs' October 9, 1992 Memorandum Contra Velsicol Chemical Corporation's Motions to Exclude Opinion Evidence of Robert K. Simon, Ph.D. at p. 8. (Emphasis in original.) If Dr. Simon believed further testing would demonstrate the presence of chlordane in the Condes' blood, he should have recommended such testing. The 1986 WALI blood tests provide no support for plaintiffs' medical causation opinions.

*Opinions of Drs. McConnachie, Zahalsky, and Simon.* The medical causation testimony of Drs. McConnachie, Zahalsky, and Simon is summarized at pp. 997–1003, above. Their opinion testimony suffers from the same defects as Dr. Conde's. They were unable to cite any human epidemiologic studies supporting their opinions.[54] See p. 1021 at nn. 47, 48, and 49. Dr. McConnachie's medical causation testimony is premised on his finding an immune system dysregulation based on the immune system panels test results. As the Court held above, the use of these panels as Dr. McConnachie proposes is experimental and not a generally accepted methodology in the fields of medicine, toxicology, and immunology. Further, Dr. McConnachie's ex-

planatory theory for why the Condes' exposure to chlordane may have caused the immune system dysregulation he finds, see pp. 997–99, above, is speculative. Nothing in the immune system panels test data for the Condes connects their exposure to chlordane with the "abnormal" CD25 and CD26 values.[55]

Dr. Zahalsky testified that James P. Conde and Autumn Conde have chronic active hepatitis. However, one basis for that determination was his reading of the immune system panels test results. Thus, his conclusion was not based on a generally accepted medical or scientific methodology. Further, Dr. Zahalsky was unable to testify to a reasonable degree of scientific certainty that they have chronic active hepatitis. Dr. Zahalsky's April 24, 1992 deposition at pp. 436–437. See pp. 999–1000, above.

■ Dr. Zahalsky believes the Condes' exposure to chlordane caused their illnesses. But he is unable to cite any supporting human epidemiologic study of commensurate residential exposure to chlordane. As he points out, there never has been an epidemiologic study of the health effects of such residential exposure to chlordane. Dr. Zahalsky's April 24, 1992 deposition at pp. 505–507. That is unfortunate for the Condes. Had there been such studies, then either they would support plaintiffs' experts' hypotheses (in which case they would prevail here) or Velsicol's (in which case they would most likely not have filed suit). Nonetheless, the absence of epidemiologic studies supporting their position is an important factor in determining whether this case should go to a jury. Epidemiologic studies are the primary generally accept-

---

**54.** They do cite critiques of human epidemiologic studies which argue that there is a correlation between long-term worker exposure to chlordane and cancer. These critiques are irrelevant to the issues to be determined here. Even assuming that the critiques establish such a correlation—which the Court does not find—they provide no support for plaintiffs' experts' opinions that chlordane caused the Condes' symptoms and diseases. The human epidemiologic studies show no correlation between long-term worker exposure to chlordane and the symptoms and diseases suffered by plaintiffs. At best, the critiques demonstrate that the design and/or interpretations of some of the human

epidemiologic studies were flawed, and that there is a need for new studies to determine whether there is, in fact, a correlation between long-term exposure to chlordane and cancer.

**55.** That is, the test results are not analogous to an X-ray, such that they show the presence of chlordane in the immune system as an X-ray might show a foreign object in the stomach. Dr. McConnachie *is* conducting a study of the immune system panels test results of 19 persons exposed to chlordane. He believes the Condes' test results are consistent with those of the 19 persons in the study.

ed methodology[56] for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease. When an expert does not rely on the primary methodology for establishing causation, then that places a burden on the expert to explain his choice of methodologies and to explain why the evidence from those methodologies should be considered reliable in the face of generally accepted medical and scientific opinion to the contrary.

As discussed above, the immune system panels test results which Dr. Zahalsky relies on, see pp. 1000–01, above, are not a generally accepted methodology. Dr. McConnachie's and Zahalsky's ongoing study of 19 persons exposed to chlordane is similarly not admissible evidence since it is based on the experimental immune system panels test results.

Dr. Zahalsky's explanatory theory is that chlordane will enter human fat cells, pertinaciously remain there, and ultimately find their way through the blood system to attack the immune system or organs with high concentrations of fat cells. See pp. 1000–01, above and Dr. Zahalsky's September 22, 1992 affidavit. Not only is this theory a speculative hypothesis unsupported by any research finding, it has no specific evidentiary support as applied to the Condes. There is no evidence of detectible amounts of chlordane accumulated in their bodies.

Dr. Zahalsky also relies on animal studies and the USEPA's listing of chlordane as a probable human carcinogen. The 1987 TSD concludes, based on rat and mice studies, that chlordane is a probable carcinogen. The 1987 TSD concluded that "none of the available epidemiology studies of the chlorinated cyclodienes are adequate to establish either a negative or positive association between chlorinated cyclodiene exposure and carcinogenic risk."

Animal studies are relied on by governmental agencies to determine public health risks; but animal studies alone are not, under the circumstances of this case, sufficiently reliable medical or scientific evidence to prove that a chemical causes human illness or disease. *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d at 1360; *Novak v. United States,* 865 F.2d 718 at 721–723 (6th Cir.1989); *In re Agent Orange Products Liability Litigation,* 611 F.Supp. 1223, 1241 (E.D.N.Y.1985).

Dr. Simon, a toxicologist, also states his belief that the Condes' symptoms are consistent with chlordane poisoning. See p. 1002, above. He believes elevated liver alkaline phosphatase in Ryan conde's blood, his exposure to chlordane, and his reported symptoms are sufficient to establish that his exposure to chlordane caused liver toxicity. However, Dr. Simon is not a medical doctor, and he is unable to make a differential diagnosis. Specialists who have treated Ryan make no finding that his liver condition is caused by his exposure to chlordane. Further, nothing in the test finding elevated alkaline phosphatase demonstrates a connection between that elevation and exposure to chlordane. Dr. Simon himself concedes there are other potential causes for elevated liver enzymes. At most, Dr. Simon can testify that Ryan's elevated enzymes "are very consistent with" his exposure to chlordane. Dr. Simon's November 13, 1991 deposition at p. 107.

*Conclusion.* For the reasons set out above, the Court concludes that plaintiffs' experts proffer no medical causation testimony which would be reliable and helpful to a jury under Rules 702 and 703, Fed. R.Evid. to assist them in determining medical causation. Since plaintiffs offer no medical causation testimony from which a jury could conclude by a preponderance of the evidence that the Condes' exposure to chlordane caused their symptoms and diseases, defendant Velsicol's motion for summary judgment on causation is GRANTED. Further, having found that plaintiffs are unable to offer evidence which, if credited, would prove the medical causation element of their product defects claim, the Court GRANTS Velsicol's motion for summary judgment on product defects.

---

**56.** Another primary methodology would be tissue or blood samples showing the presence of chlordane or its metabolites in the body. There is no such evidence here.

## PROPERTY DAMAGE CLAIMS

■ Defendant moves for summary judgment dismissing plaintiffs' property damage claims on the ground that plaintiffs have failed to prove that their property has been damaged or devalued in any way.

First, defendant argues that the highest air concentration of chlordane, as measured by Dr. Simon, is minuscule, less than 1ug/m³. Defendant argues that in light of the low air levels of chlordane the ODOH has stated that the home could be occupied by persons other than the Condes.[57] Second, defendant argues that plaintiffs have made no attempt to sell the property. Finally, Velsicol argues that plaintiffs' real estate appraiser offers only a subjective and unreliable estimate as to the home's value. In light of these arguments, Velsicol asserts first, that the property has not been devalued in any way; and second, that even if it had been damaged, plaintiffs are able to offer only speculative and subjective evidence as to the measure of damages.

Plaintiffs respond that Velsicol has mischaracterized the evidence relating to the present condition of their home. Plaintiffs argue that they have identified governmental taxing authorities, health departments, and environmental agencies who have all found that the existence of chlordane in the Condes' home constitutes proof of actual and substantial property damage.

Velsicol's argument that the air concentration of chlordane is less than 1ug/m³, and therefore the home is not contaminated, ignores substantial evidence of chlordane contamination in the record. In his inspection of the Conde residence, Dr. Simon analyzed not only air samples, but also examined the concentrations of chlordane on surfaces and bulk material within the home. Although Dr. Irons states in his affidavit that, in his opinion, the bulk, wipe, and bulk/wipe samples do not alter the

exposure comparison between the Condes and chemical industry workers, see p. 97 above, his opinions on medical causation are not dispositive on the question of property damage. The ODOH has recognized that surface contamination poses at least a marginal health threat. Far from giving the Condes a "green light" to sell, as Velsicol maintains, the ODOH letter is more circumspect. Specifically the letter concludes:

> It appears that this residence could be reinhabited by individuals other than the Condes under the following conditions:
>
> a. If the property is put on the market, information about the chlordane misapplication should be disclosed for the protection of the future purchaser.
>
> b. The EPA considers chlordane a probable human carcinogen for which any exposure involves some risk (*Toxicological Profile for Chlordane*, Agency for Toxic Substances and Disease Registry, U.S. Public Health Service, 1989, pg 8). If the Conde house has not already been cleaned up, the information presented in various termiticide cleanup manuals (eg. Velsicol Chemical Corporation, Termiticide Cleanup Manual) would be of assistance in further cleanup procedures. Suggestions for cleanup include: All cracks in the basement should be closed to prevent the re-entry of the chlordane. The contaminated soil might be excavated. The walls, floors, foundation, and other contaminated surfaces should be washed (using the suggested solvents and methods) and then treated with a sealant, such as polyurethane epoxy or enamel paint. The top row of foundation blocks might be treated with expandable polyurethane foam or with concrete.
>
> c. Textiles such as carpeting, upholstered furniture, and other items, which may serve as reservoirs for chlordane, should be removed from the property and disposed off [sic] by approved sani-

---

**57.** Despite including the ODOH opinion letter in its Appendix in support of Dispositive Motions and arguing that the ODOH "concluded that plaintiffs' house was *inhabitable* without undue risk," Velsicol's Reply Brief in Support of Motion for Summary Judgment on Property Dam-

age Claims at p. 9 (emphasis in original) and n. 14, Velsicol objects to plaintiffs' use of the opinion letter at trial. Velsicol's October 5, 1992 Memorandum Re Admissibility, ¶ 12. The Court reserves ruling on the admissibility of the letter should this case go to trial.

tary procedures. The house should be ventilated until no noticeable odor of chlordane remains.

d. The air samples taken inside the Conde home in 1987 were in the range of 0 to 4.4 ug/m³. These values are within the range, >0.001 to 610 ug/m³, shown for indoor air in a sampling of homes, many of which had been treated with chlordane, (*Toxicological Profile for Chlordane*, Agency for Toxic Substances and Disease Registry, U.S. Public Health Service, 1989, pg 76). This range is also within the 5 ug/m³ value shown in the NRC guidelines for military housing (*Toxicological Profile for Chlordane*, Agency for Toxic Substances and Disease Registry, U.S. Public Health Service, 1989 pg 104). Future occupants of the home may wish to monitor chlordane levels by various sampling methods in order to verify that the house is safe for occupancy.

Based on these facts alone, the Court must conclude that a genuine issue of material fact exists as to whether plaintiffs' property has been damaged or devalued in any way.

Plaintiffs have also presented the testimony of Dottie Turner, a certified real estate appraiser, in support of their claim. Velsicol maintains that Ms. Dottie Turner, plaintiffs' real estate appraiser, provides only speculative and subjective conclusions regarding the valuation of the Conde home. First, Velsicol maintains that Ms. Turner is unreliable because she has stated: first, that it would be against her moral judgment to sell a house that appears to be uninhabitable; second, she has admitted that she is not an expert when it comes to valuing homes contaminated with toxic substances; and third, she has admitted that she has no training in toxicology or medicine and that she cannot state, as a matter of science or medicine, that the house is uninhabitable.

Plaintiffs assert that Ms. Turner's appraisal of the Conde home is based on objective factors, such as the condition of the exterior siding, downspouts, condition of the living areas and the like, as well as more subjective factors such as the legal,

ethical and public perception considerations involved in selling a home contaminated with an arguably dangerous chemical.

Ms. Turner's deposition testimony reveals that she did undertake a detailed study of the Conde home. When appraising a home, Ms. Turner stated that she evaluates what condition the house is in "all over inside and out." (Tr. 26.) Although Ms. Turner has never done an appraisal on an allegedly contaminated house, this fact would go to the weight rather than the substance of her testimony. Ms. Turner is a qualified real estate appraiser. She has been a realtor, appraiser and broker in Southern Ohio for the past 12 years; and she testified that she has sold over 200 homes, appraised over 500 homes, and has been retained as an appraiser by attorneys, banks and lending institution. (Tr. 67.)

The Meigs County Board of Revision has also concluded that the Conde home has been damaged. Prior to treatment with chlordane, the Conde home was appraised at $136,630.00. Following treatment, the Meigs County Board of Revision reduced the value to $22,680.00. Of this new value, no amount was attributed to the home. But rather, the land was valued at $5,900, the swimming pool was valued at $10,380, and the garage at $6,400.00. The Board of Revision reached this conclusion after hearing the Condes' complaint, viewing the property, and receiving a recommendation from a professional appraisal firm retained by the county. Velsicol has suggested that this assessment is untrustworthy because Dr. Conde is on a first name basis with members of the Board of Revision. While such evidence, if true, might tend to impeach the Board of Assessments' conclusions, on a motion for summary judgment "the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *accord Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1455–1456 (6th Cir.1984).

Velsicol stresses the fact that the Condes have not attempted to sell their home. The Condes argue that it would be unethical, and perhaps illegal, to sell their home in its present condition. The ODOH opinion let-

ter supports this conclusion. It is a fundamental principle of damages that a person who suffers property loss as a result of a tort, must use reasonable care to avoid loss or to minimize the damages which result. *See* 30 O.Jur.3d, Damages § 16. Velsicol may clearly present this theory to reduce the measure of damages to which plaintiffs may be entitled. *Id.* Based on the evidence outlined above, a finder of fact could conclude by a preponderance of the evidence that plaintiffs' property was damaged or devalued in some way. For example, if the ODOH recommendations for decontaminating the property were accepted, the house would have to be cleaned, cracks repaired, carpeting and upholstery removed and replaced, the top foundation blocks be treated with polyurethane foam or concrete, and so on. At the other end of the scale, Ms. Turner, Dr. Simon, and the Meigs County Board of Revision have stated the home has no value. The exact measure of damages is a question of fact best left to the factfinder.

Based on the foregoing factors, the Court concludes that a genuine issue of material fact exist precluding summary judgment for defendant on plaintiffs' property damage claim.

### SUMMARY

Plaintiffs' motion to file a second amended complaint is GRANTED. The Clerk of Court is directed to file plaintiffs' second amended complaint. Defendant's motions for summary judgment on medical causation and the product defects claim are GRANTED. Defendant's motions to exclude the opinion testimony of Drs. Conde, McConnachie and Zahalsky are DENIED. Defendant's first motion to strike improper Rule 56(e) material is GRANTED in part and DENIED in part. Defendant's motion to exclude the 1987 Technical Support Document is DENIED. Defendant's motion for summary judgment on property damage claims is DENIED.

IT IS SO ORDERED.